# FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.* BEACH COMMUNICATIONS, INC., ET AL.

No. 92–603.   Argued March 29, 1993—Decided June 1, 1993

*John F. Manning* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Acting Solicitor General Bryson, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Douglas N. Letter,* and *Bruce G. Forrest.*

*Deborah C. Costlow* argued the cause for respondents. With her on the brief for respondents Beach Communica-

tions, Inc., et al. was *Thomas C. Power.* *Daniel L. Brenner, Michael S. Schooler, Diane B. Burstein, H. Bartow Farr III,* and *Paul M. Smith* filed a brief for respondent National Cable Television Association.*

JUSTICE THOMAS delivered the opinion of the Court.

In providing for the regulation of cable television facilities, Congress has drawn a distinction between facilities that serve separately owned and managed buildings and those that serve one or more buildings under common ownership or management. Cable facilities in the latter category are exempt from regulation as long as they provide services without using public rights-of-way. The question before us is whether there is any conceivable rational basis justifying this distinction for purposes of the Due Process Clause of the Fifth Amendment.

I

The Cable Communications Policy Act of 1984 (Cable Act), 98 Stat. 2779, amended the Communications Act of 1934, 47 U. S. C. § 151 *et seq.*, to establish a national framework for regulating cable television. One objective of the Cable Act was to set out "franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community." § 601(2), 47 U. S. C. § 521(2). To that end, Congress provided for the franchising of cable systems by local governmental authorities, § 621(a), 47 U. S. C. § 541(a), and prohibited any person from operating a cable system without a franchise, subject to certain exceptions, § 621(b), 47 U. S. C. § 541(b). Section 602(7) of the Communications Act, as amended, 47 U. S. C. A. § 522(7) (Supp. 1993), determines the reach of the franchise require-

*Richard Ruda* filed a brief for the National League of Cities et al. as *amici curiae* urging reversal.

ment by defining the operative term "cable system."[1]  A cable system means any facility designed to provide video programming to multiple subscribers through "closed transmission paths," but does not include, *inter alia,*

> "a facility that serves only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities us[e] any public right-of-way." § 602(7)(B), 47 U. S. C. § 522(7)(B) (1988 ed., Supp. V).

In part, this provision tracks a regulatory "private cable" exemption previously promulgated by the Federal Communications Commission (FCC or Commission) pursuant to preexisting authority under the Communications Act.  See 47 CFR § 76.5(a) (1984) (exempting from the definition of "cable television system" "any such facility that serves or will serve only subscribers in one or more multiple unit dwellings under common ownership, control, or management").  The earlier regulatory exemption derived in turn from the Commission's first set of cable rules, published in 1965.  See *Rules re Microwave-Served CATV,* 38 F. C. C. 683, 741 (1965) (exempting from the definition of "community antenna television system" "any such facility which serves only the residents of one or more apartment dwellings under common ownership, control, or management, and commercial establishments located on the premises of such an apartment house").  The Cable Act narrowed the terms of the regulatory exemption by further excluding from the exemption any closed transmission facilities that use public rights-of-way.

---

[1] The Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102–385, 106 Stat. 1460—enacted after the decision of the Court of Appeals in this case—amended the Communications Act to provide, among other things, for the regulation of rates charged by cable systems.  See § 3, 106 Stat. 1464.  The 1992 Act renumbered the subsections of 47 U. S. C. § 522 but did not amend the provision at issue, which is now subsection (7).  We refer to the current version of the Communications Act.

This case arises out of an FCC proceeding clarifying the agency's interpretation of the term "cable system" as it is used in the Cable Act. See *In re Definition of a Cable Television System*, 5 F. C. C. Rcd. 7638 (1990). In this proceeding, the Commission addressed the application of the exemption codified in § 602(7)(B) to satellite master antenna television (SMATV) facilities. Unlike a traditional cable television system, which delivers video programming to a large community of subscribers through coaxial cables laid under city streets or along utility lines, an SMATV system typically receives a signal from a satellite through a small satellite dish located on a rooftop and then retransmits the signal by wire to units within a building or complex of buildings. See 5 F. C. C. Rcd., at 7639. The Commission ruled that an SMATV system that serves multiple buildings via a network of interconnected physical transmission lines is a cable system, unless it falls within the § 602(7)(B) exemption. See *id.*, at 7639–7640. Consistent with the plain terms of the statutory exemption, the Commission concluded that such an SMATV system is subject to the franchise requirement if its transmission lines interconnect separately owned and managed buildings or if its lines use or cross any public right-of-way. See *id.*, at 7641–7642.[2]

Respondents Beach Communications, Inc., Maxtel Limited Partnership, Pacific Cablevision, and Western Cable Communications, Inc.—SMATV operators that would be subject to franchising under the Cable Act as construed by the Commission—petitioned the Court of Appeals for review. The

---

[2] In its initial interpretation of the Cable Act, the Commission had ruled that the dispositive distinction between a cable system and other video distribution systems was "the crossing of the public rights-of-way, not the ownership, control or management" of the buildings served. *In re Amendments of Parts 1, 63, & 76*, 104 F. C. C. 2d 386, 396–397 (1986). After a District Court held that this interpretation contravened the unambiguous terms of the statute, the Commission abandoned it in the proceedings at issue here. See *In re Definition of a Cable Television System*, 5 F. C. C. Rcd. 7638, 7641 (1990).

Court of Appeals rejected respondents' statutory challenge to the Commission's interpretation, but a majority of the court found merit in the claim that § 602(7) violates the implied equal protection guarantee of the Due Process Clause. 294 U. S. App. D. C. 377, 959 F. 2d 975 (1992). In the absence of what it termed "the predominant rationale for local franchising" (use of public rights-of-way), the court saw no rational basis "[o]n the record," and was "unable to imagine" any conceivable basis, for distinguishing between those facilities exempted by the statute and those SMATV cable systems that link separately owned and managed buildings. *Id.*, at 389, 959 F. 2d, at 987. The court remanded the record and directed the FCC to provide "additional 'legislative facts'" to justify the distinction. *Ibid.*[3]

A report subsequently filed by the Commission failed to satisfy the Court of Appeals. The Commission stated that it was "unaware of any desirable policy or other considerations . . . that would support the challenged distinctions," other than those offered by a concurring member of the court. App. to Pet. for Cert. 50a. The concurrence had believed it sufficient that Congress *could* have reasoned that SMATV systems serving separately owned buildings are more similar to traditional cable systems than are facilities serving commonly owned buildings, in terms of the problems presented for consumers and the potential for regulatory benefits. See 294 U. S. App. D. C., at 392, 959 F. 2d, at 990 (Mikva, C. J., concurring in part and concurring in judgment). In a second opinion, the majority found this rationale to be

---

[3] Respondents also claimed that the Cable Act's franchise requirement violates the First Amendment and that the § 602(7)(B) classification should receive heightened scrutiny under the Due Process Clause because it discriminates on the basis of speech activities. The Court of Appeals held the First Amendment claim unripe, 294 U. S. App. D. C., at 386–387, 959 F. 2d, at 984–985, and refused to address the heightened scrutiny argument without first applying "rational basis" analysis, *id.*, at 388, 959 F. 2d, at 986.

"a naked intuition, unsupported by conceivable facts or policies," 296 U. S. App. D. C. 141, 143, 965 F. 2d 1103, 1105 (1992), and held that "the Cable Act violates the equal protection component of the Fifth Amendment, insofar as it imposes a discriminatory franchising requirement," *id.*, at 142, 965 F. 2d, at 1104.[4] The court declared the franchise requirement void to the extent it covers respondents and similarly situated SMATV operators. *Id.*, at 144, 965 F. 2d, at 1106.[5]

Because the Court of Appeals held an Act of Congress unconstitutional, we granted certiorari. 506 U. S. 997 (1992). We now reverse.

## II

Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. See *Sullivan* v. *Stroop,* 496 U. S. 478, 485 (1990); *Bowen* v. *Gilliard,* 483 U. S. 587, 600–603 (1987); *United States Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 174–179 (1980); *Dandridge* v. *Williams,* 397 U. S. 471, 484–485 (1970). Where there are "plausible reasons" for

---

[4] Chief Judge Mikva dissented for the reasons given in his earlier concurrence. 296 U. S. App. D. C., at 144, 965 F. 2d, at 1106.

[5] The Court of Appeals had also questioned whether there existed a rational basis for distinguishing facilities connecting separately owned buildings by wire from those that do not connect separate buildings or that do so only by wireless media, such as radio or microwave transmission. See 294 U. S. App. D. C., at 382, 389, 959 F. 2d, at 980, 987. In its second opinion, however, the court found it unnecessary to consider that question, see 296 U. S. App. D. C., at 143, 965 F. 2d, at 1105, and it is not presented here.

Congress' action, "our inquiry is at an end." *United States Railroad Retirement Bd.* v. *Fritz, supra,* at 179. This standard of review is a paradigm of judicial restraint. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979) (footnote omitted).[6]

On rational-basis review, a classification in a statute such as the Cable Act comes to us bearing a strong presumption of validity, see *Lyng* v. *Automobile Workers,* 485 U. S. 360,

---

[6] As they did in the Court of Appeals, respondents seek heightened scrutiny, claiming that the statute discriminates on the basis of First Amendment activities. Brief for Respondents Beach Communications, Inc., et al. 12–17 (hereinafter Brief for Respondents). We will confine ourselves, however, to the question presented, which is limited to whether the distinction in § 602(7)(B) is "rationally related to a legitimate government purpose under the Due Process Clause." Pet. for Cert. I. The Court of Appeals did not reach respondents' heightened-scrutiny challenge because it found merit in their rational-basis contentions. 294 U. S. App. D. C., at 388, 959 F. 2d, at 986. In renewing their arguments for heightened scrutiny here, see Brief for Respondents 14–15, respondents point to the burdens imposed on franchised cable systems under the newly enacted Cable Television Consumer Protection and Competition Act of 1992, an Act the Court of Appeals had no opportunity to consider. In these circumstances, respondents' arguments for heightened scrutiny are best left open for consideration by the Court of Appeals on remand.

Respondents also raise a threshold issue. They argue that no case or controversy exists, or that the issue is "moot," on the theory that Congress "adopted" the Court of Appeals' "construction" of § 602(7) (presumably thereby acquiescing in the judgment that local franchising must depend on use of public rights-of-way) when it took no action to amend or defend the provision in later passing the 1992 Act. Brief for Respondents 8–12. Cf. *Lorillard* v. *Pons,* 434 U. S. 575, 580–581 (1978). This notion of congressional adoption of statutory interpretations, however, has no place in constitutional review, and the controversy presented in this case is obviously a live one, since petitioners stand ready to defend the statute as drafted.

370 (1988), and those attacking the rationality of the legislative classification have the burden "to negative every conceivable basis which might support it," *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 364 (1973) (internal quotation marks omitted). See also *Hodel* v. *Indiana*, 452 U. S. 314, 331–332 (1981). Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. *United States Railroad Retirement Bd.* v. *Fritz, supra,* at 179. See *Flemming* v. *Nestor,* 363 U. S. 603, 612 (1960). Thus, the absence of "'legislative facts'" explaining the distinction "[o]n the record," 294 U. S. App. D. C., at 389, 959 F. 2d, at 987, has no significance in rational-basis analysis. See *Nordlinger* v. *Hahn,* 505 U. S. 1, 15 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"). In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. See *Vance* v. *Bradley, supra,* at 111. See also *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 464 (1981). "'Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.'" *Lehnhausen, supra,* at 365 (quoting *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 510 (1937)).

These restraints on judicial review have added force "where the legislature must necessarily engage in a process of line-drawing." *United States Railroad Retirement Bd.* v. *Fritz,* 449 U. S., at 179. Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—"inevitably requires that some persons who have an almost equally strong claim to favored treat-

ment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Ibid.* (internal quotation marks and citation omitted). The distinction at issue here represents such a line: By excluding from the definition of "cable system" those facilities that serve commonly owned or managed buildings without using public rights-of-way, § 602(7)(B) delineates the bounds of the regulatory field. Such scope-of-coverage provisions are unavoidable components of most economic or social legislation. In establishing the franchise requirement, Congress had to draw the line somewhere; it had to choose which facilities to franchise. This necessity renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally. See, e. g., *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483 (1955):

> "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Id.,* at 489 (citations omitted).[7]

---

[7] See also *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970) (classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality") (internal quotation marks omitted); *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, 69–70 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific"); *Heath & Milligan Mfg. Co.* v. *Worst,* 207

Applying these principles, we conclude that the common-ownership distinction is constitutional. There are at least two possible bases for the distinction; either one suffices. First, Congress borrowed § 602(7)(B) from pre-Cable Act regulations, and although the existence of a prior administrative scheme is certainly not necessary to the rationality of the statute, it is plausible that Congress also adopted the FCC's earlier rationale. Under that rationale, common ownership was thought to be indicative of those systems for which the costs of regulation would outweigh the benefits to consumers. Because the number of subscribers was a similar indicator, the Commission also exempted cable facilities that served fewer than 50 subscribers. See 47 CFR § 76.5(a) (1984). In explaining both exemptions, the Commission stated:

> "[N]ot all [systems] can be subject to effective regulation with the resources available nor is regulation necessarily needed in every instance. A sensible regulatory program requires that a division between the regulated and unregulated be made in a manner which best conserves regulatory energies and allows the most cost effective use of available resources. In attempting to make this division, we have focused on subscriber numbers as well as the multiple unit dwelling indicia on the theory that the very small are inefficient to regulate and can safely be ignored in terms of their potential for impact on broadcast service to the public and on multiple unit dwelling facilities on the theory that this effectively establishes certain maximum size limitations." *In re Definition of a Cable Television System*, 67 F. C. C. 2d 716, 726 (1978).

---

U. S. 338, 354 (1907) ("logical appropriateness of the inclusion or exclusion of objects or persons" and "exact wisdom and nice adaptation of remedies are not required").

This regulatory-efficiency model, originally suggested by Chief Judge Mikva in his concurring opinion, provides a conceivable basis for the common-ownership exemption. A legislator might rationally assume that systems serving only commonly owned or managed buildings without crossing public rights-of-way would typically be limited in size or would share some other attribute affecting their impact on the welfare of cable viewers such that regulators could "safely ignor[e]" these systems.

Respondents argue that Congress did not intend common ownership to be a surrogate for small size, since Congress simultaneously rejected the FCC's 50-subscriber exemption by omitting it from the Cable Act. Brief for Respondents 22. Whether the posited reason for the challenged distinction actually motivated Congress is "constitutionally irrelevant," *United States Railroad Retirement Bd.* v. *Fritz*, *supra*, at 179 (internal quotation marks omitted), and, in any event, the FCC's explanation indicates that both common ownership and number of subscribers were considered indicia of "very small" cable systems. Respondents also contend that an SMATV operator could increase his subscription base and still qualify for the exemption simply by installing a separate satellite dish on each building served. Brief for Respondents 42. The additional cost of multiple dishes and associated transmission equipment, however, would impose an independent constraint on system size.

Furthermore, small size is only one plausible ownership-related factor contributing to consumer welfare. Subscriber influence is another. Where an SMATV system serves a complex of buildings under common ownership or management, individual subscribers could conceivably have greater bargaining power vis-à-vis the cable operator (even if the number of dwelling units were large), since all the subscribers could negotiate with one voice through the common owner or manager. Such an owner might have substantial leverage, because he could withhold permission to operate

the SMATV system on his property. He would also have an incentive to guard the interests of his tenants. Thus, there could be less need to establish regulatory safeguards for subscribers in commonly owned complexes. Respondents acknowledge such possibilities, see *id.*, at 44, and we certainly cannot say that these assumptions would be irrational.[8]

There is a second conceivable basis for the statutory distinction. Suppose competing SMATV operators wish to sell video programming to subscribers in a group of contiguous buildings, such as a single city block, which can be interconnected by wire without crossing a public right-of-way. If all the buildings belong to one owner or are commonly managed, that owner or manager could freely negotiate a deal for all subscribers on a competitive basis. But if the buildings are separately owned and managed, the first SMATV operator who gains a foothold by signing a contract and installing a satellite dish and associated transmission equipment on one of the buildings would enjoy a powerful cost advantage in competing for the remaining subscribers: He could connect

---

[8] According to respondents, the FCC's pre-Cable Act common-ownership exemption provides no support for the rationality of § 602(7)(B) for another reason. They assert that the regulatory exemption's sole purpose was to exempt master antenna television (MATV) facilities—ordinary rooftop antenna facilities that receive conventional broadcast signals for transmission by wire to units within a single multiunit building or complex, see 294 U. S. App. D. C., at 379–380, 959 F. 2d, at 977–978. Respondents argue that this prior exemption merely reflected the FCC's judgment that common antennas, unlike SMATV systems, were nothing more than residential amenities posing no threat to broadcast services. See Brief for Respondents 23–25. This argument is unavailing, because Congress is not bound by the administrative derivation of the "private cable" exemption. Moreover, regardless of the origin of the exemption, the Commission had already applied it to SMATV facilities before passage of the Cable Act. See *In re Earth Satellite Communications, Inc.*, 95 F. C. C. 2d 1223, 1224, n. 3 (1983), aff'd *sub nom. New York State Comm'n on Cable Television* v. *FCC*, 242 U. S. App. D. C. 126, 749 F. 2d 804 (1984). Indeed, in these proceedings, the Commission construed § 602(7) to apply equally to SMATV and MATV facilities. See 5 F. C. C. Rcd., at 7639–7641.

additional buildings for the cost of a few feet of cable, whereas any competitor would have to recover the cost of his own satellite headend facility. Thus, the first operator could charge rates well above his cost and still undercut the competition. This potential for effective monopoly power might theoretically justify regulating the latter class of SMATV systems and not the former.

## III

The Court of Appeals quite evidently believed that the crossing or use of a public right-of-way is the only conceivable basis upon which Congress could rationally require local franchising of SMATV systems. See 296 U. S. App. D. C., at 143, 965 F. 2d, at 1105; 294 U. S. App. D. C., at 389, 959 F. 2d, at 987. As we have indicated, however, there are plausible rationales unrelated to the use of public rights-of-way for regulating cable facilities serving separately owned and managed buildings. The assumptions underlying these rationales may be erroneous, but the very fact that they are "arguable" is sufficient, on rational-basis review, to "immuniz[e]" the congressional choice from constitutional challenge. *Vance* v. *Bradley*, 440 U. S., at 112.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, concurring in the judgment.

Freedom is a blessing. Regulation is sometimes necessary, but it is always burdensome. A decision *not to regulate* the way in which an owner chooses to enjoy the benefits of an improvement to his own property is adequately justified by a presumption in favor of freedom.

If the owner of a large building decides to improve it by installing his own electric generator, or by placing a windmill on the roof, government might well decide to regulate his

use of that improvement. But if government permits the installation, it can surely allow the owner to use the electricity that it generates for whichever appliances on the property that he selects. However, if the owner elects to sell electricity to his neighbors, a justification for regulation that did not previously exist might arise. For he would be seeking access to an already regulated market.

A television antenna, like a windmill, is a somewhat unsightly species of improvement. Nonetheless, the same analysis applies. Government may reasonably decide to regulate the distribution of electricity or television programs to paying customers in the open market without also regulating the way in which the owner of the antenna, or the windmill, distributes its benefits within the confines of his own property. In my opinion the interest in the free use of one's own property provides adequate support for an exception from burdensome regulation and franchising requirements even when the property is occupied not only by family members and guests, but by lessees and co-owners as well, and even when the property complex encompasses multiple buildings.

The master antenna serving multiple units in an apartment building is less unsightly than a forest of individual antennas, each serving a separate apartment. It was surely sensible to allow owners to make use of such an improvement without incurring the costs of franchising and economic regulation. Even though regulation might have been justified—indeed, the Federal Communications Commission (FCC) at one time considered imposing such regulation, see *Cable Television Systems*, 63 F. C. C. 2d 956, 996–998 (1977)—a justification for nonregulation would nevertheless remain: Whenever possible, property owners should be free to use improvements to their property as they see fit.

That brings us to the "private cable" exemption as applied to satellite master antenna television (SMATV) systems. A justification for the "private cable" exemption that rests on

the presumption that an owner of property should be allowed to use an improvement on his own property as he sees fit unless there is a sufficient public interest in denying him that right simply does not apply to the situation in which the improvement—here, the satellite antenna—is being used to distribute signals to subscribers on *other people's property.* In that situation, the property owner, or the SMATV operator, has reached out beyond the property line and is seeking to employ the satellite antenna in the broader market for television programming. While the crossing of that line need not trigger regulatory intervention, and the absence of such a crossing may not prevent such intervention, it certainly cannot be said that government is disabled, by the Constitution, from regulating in the case of the former and abstaining in the case of the latter. Such a policy is adequately justified by the presumption in favor of freedom.

Thus, while I am not fully persuaded that the "private cable" exemption is justified by the size of the market which it encompasses, see *ante,* at 317–318,[1] or by the Court's "monopoly" rationale, see *ante,* at 319–320,[2] I agree with its

---

[1] Approximately 25% of all multiple dwellings units are in complexes large enough to support an SMATV system. See C. Ferris, Cable Television Law: A Video Communications Practice Guide ¶ 21.02, p. 21–3, n. 2 (1983). Furthermore, whereas the FCC had, prior to enactment to the Cable Communications Policy Act of 1984 (Cable Act), 98 Stat. 2779, exempted from regulation cable systems of less than 50 subscribers *as well as* those serving commonly owned multiple unit dwellings, Congress exempted only the latter when it passed the Cable Act, leaving out the exemption based on system size. Respondents thus make a strong argument that Congress may have rejected the very rationale upon which the FCC, and the Court, rely.

[2] The Court's theory assumes a great deal about the nature of what is essentially a hypothetical market. Moreover, the Court's analysis overlooks the competitive presence of traditional cable as a potential constraint on an SMATV operator's capacity to extract monopoly rents from landlords.

ultimate conclusion. In my judgment, it is reasonable to presume[3] that Congress was motivated by an interest in allowing property owners to exercise freedom in the use of their own property. Legislation so motivated surely does not violate the sovereign's duty to govern impartially. See *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976). Accordingly, I concur in the judgment of the Court.

---

[3] The Court states that a legislative classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and that "[w]here there are 'plausible reasons' for Congress' action, 'our inquiry is at an end,'" *ante*, at 313–314. In my view, this formulation sweeps too broadly, for it is difficult to imagine a legislative classification that could *not* be supported by a "reasonably conceivable state of facts." Judicial review under the "conceivable set of facts" test is tantamount to no review at all.

I continue to believe that when Congress imposes a burden on one group, but leaves unaffected another that is similarly, though not identically, situated, "the Constitution requires something more than merely a 'conceivable' or 'plausible' explanation for the unequal treatment." *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 180 (1980) (STEVENS, J., concurring in judgment). In my view, when the actual rationale for the legislative classification is unclear, we should inquire whether the classification is rationally related to "a legitimate purpose that we may *reasonably presume* to have motivated an impartial legislature." *Id.*, at 181 (emphasis added).