*1079 CLIFTON, Circuit Judge,
dissenting:
The words “equal protection” did not appear in the opening brief- filed on behalf of Petitioner Solomon Ledezma-Cosino. Given that, it is not surprising that they did not appear in the government’s answering brief, either. Ledezma did not file a reply brief. ■ So how did the issue arise? - -
The argument deemed persuasive in the majority opinion is an argument of the majority’s own creation. Ledezma did not make that argument until urged to do so by the majority at oral argument and via a subsequent order for supplemental briefing. Perhaps that pride of authorship helps to explain why the majority finds the argument persuasive, despite its obvious and multiple flaws.
Our decision in this case disregards the legal standard to be applied. The “rational ' basis” test sets a very; low bar, and Congress has exceptionally'broad power in determining which classes of aliens may remain in the country. The statute at issue here, 8 U.S.C. § 1101(f)(1), should easily clear that bar.
It does not, in the majority’s view, only because the majority relies üpon a false factual dichotomy — that diagnosis of the condition of chronic alcoholism as “medical” means that there can be no element of drunkenness that is subject to free will or susceptible to a moral evaluation. The majority then goes on to- hold that it is irrational for Congress to have- reached a conclusion on that subject contrary to the majority’s own view. Specifically, the majority assumes that a person found to be a habitual drunkard is in that state only because of factors beyond his control, such that it is irrational to hold him accountable for it.' But chronic alcoholics do not have to be habitual drunkards. Ledezma himself puts the lie to the majority’s assumed premise, because despite his alcoholism, and ito his credit, the record in this case tells us that he ultimately overcame that condition and stopped drinking.
I respectfully dissent.
I. The Legal Standard
The majority opinion concludes that 8 U.S.C. § 1101(f)(1) fails the rational basis test. That means that the statute, in the words of the majority opinion, at 1074-75, is not “rationally related to a legitimate government interest” and its “‘relationship to an asserted, goal is so attenuated as to render the distinction arbitrary or irrational.’ ” (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).
The rational basis test does not set a standard that is tough to satisfy. A legislative classification “must be .upheld against equal protection,challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Federal statutes enjoy “a strong presumption of validity,” “and those attacking the rationality of the legislative classification have the burden ‘to negative every conceivable basis which might support it[.]’ ” Id. at 314-15, 113 S.Ct. 2096 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). Rational basis review does not provide “a license for courts to judge the wisdom, fairness, or logic of legislative choices.” Id. at 313, 113 S.Ct. 2096.
The rational basis test is particularly forgiving in the context of immigration policy. “[Ojver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.” Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). Like *1080 wise, “the right to terminate hospitality to aliens,” and “the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.” Id. “In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.” Demore v. Kim, 538 U.S. 510, 511, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003).
II. False Factual Premise
The majority begins with a false factual dichotomy — that diagnosis of the condition of chronic alcoholism as “medical” means that there can be no element of drunkenness that is subject to free will or susceptible to a moral evaluation. But if chronic alcoholics really had no ability to control their conduct, then such individuals would never be able to stop drinking. We know that is not the case, as Ledezma himself laudably demonstrated. Chronic alcoholics do not have to be habitual drunkards.
The majority, in disregard of the standard of review, discredited scientific and behavioral evidence tending to establish the volitional component of alcoholism that is properly subject to moral evaluation. One study cited by the government collected reams of scientific literature addressing the dominant view that “motivation” is a critical component of positive treatment outcomes. See William R. Miller, Motivation for Treatment: A Review With Special Emphasis on Alcoholism, 98 Psychological Bulletin 84 (1985) (recounting survey evidence that among alcoholism treatment personnel “75% believed patient motivation to be important to recovery, and 50% viewed it as essential”). The study noted that “motivation is frequently described as a prerequisite and a sine qua non for treatment, without which the therapist can do nothing[.]” Id. Endorsing that concept, the author concluded that motivation could be increased by “setting demanding but- attainable goals.” Id. at 99. Put differently, the Miller study showed that- chronic alcoholics who received consistent reinforcement for their daily decision not to drink were more likely to avoid relapsing into habitual intoxication.
The majority opinion, at 1076, discredits reliance on the Miller study by mischarac-terizing the government’s argument. The majority argues that the study does not support the proposition that alcoholics lack motivation and notes that the study discredits what is known as the “trait model.” But the government never argued that alcoholics lack motivation or that they fit a specific trait model. It argued only that habitual drunkenness has a volitional component. That point is amply supported by the Miller study and by the voluminous literature it discussed. By contrast, the position favored by the majority — that alcoholics have no ability to refrain from habitual drunkenness — finds very little support in the scientific literature. See, e.g., Am. Psych. Assoc., Diagnostic and Statistical Manual of Mental Disorders 490, 493 (5th ed. 2013) (explaining that “[ajlcohol use disorder is often erroneously perceived as an intractable condition”).
Even if the issue were debatable, that does not provide a license for the majority to override Congress. “[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.” Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096. Congress could have rationally speculated that chronic alcoholism has a volitional component. Therefore, it could rationally exclude habitual drunkards from discretionary deportation benefits because such *1081 individuals engage in volitional conduct that imposes a significant burden on public health and safety.
III. False Legal Premises
The majority also engages several false legal premises.

A. The Majority Misidentifies the Goal of the Statute

The majority opinion, at 1075, identifies the central question in this'case as whether it is “rational for the government to find that people with chronic alcoholism are morally bad people solely because of their disease[.]” But that is decidedly not the question'that is before the court. The real question iá whether “there is any reasonably conceivable state of facts that could provide a rational basis for” denying discretionary deportation benefits to habitual drunkards. Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096. The answer should be obvious. Congress has unquestionable power to exclude certain groups of aliens regardless of any moral culpability. See Kim, 538 U.S. at 521-22, 123 S.Ct. 1708. This is particularly true where the identified group threatens or even simply burdens institutions of public health and safety.
Such is the case here. The impacts of alcohol abuse on crime and public safety are “extensive and far-reaching.” U.S. Dep’t of Justice, Alcohol and Crime 2 (1998). “About 3 million violent crimes occur each year in which victims perceive the offender to have been drinking at the time of the offense.” Id. at 5. “Two-thirds of victims who suffered violence by an intimate ... reported that alcohol had been a factor. Among spouse victims, 3 out of 4 incidents were reported to have involved an offender who had been drinking.” Id. Approximately “40% of individuals in the United States experience an alcohol-related adverse event at some time in their lives, with alcohol accounting for up to 55% of fatal driving events.” DSM V, supra, at 49.6. .
The majority responds, at 1077, by invoking its false framework. It argues that “the link between alcohol and violence does not make being the victim of the disease of alcoholism equivalent to possessing poor moral character.” That is irrelevant to the real question in this case, which is whether Congress had a rational basis for excluding habitual drunkards from discretionary deportation benefits. ‘ Clearly it did. The demonstrable link between alcohol use and violence firmly establishes the rationality of 8 U.S.C.§ 1101(f).
B. A Medical Condition Is Not a Con- ' stitutional Talisman
Another false legai premise-is the majority’s apparent view that Congress could not rationally exclude a category of aliens on the basis of a medical condition. But the government’s ability to exclude individuals is “exceptionally broad.” Fiallo v. Bell, 430 U.S. at 792, 97 S.Ct. 1473. Does the majority seriously doubt the government’s ability to exclude individuals infected with the Ebola virus or individual carriers of antibiotic-resistant -bacteria from this country? Or perhaps the majority believes that because a condition is medically describable, it is impervious to moral judgment. But we know that cannot be the case. Pedophilia is a medically describable condition that can overwhelm an individual’s decision-making capacity, and yet nothing would or should prevent Congress from excluding known pedophiles under the framework of moral character. In short, the bare fact -that a condition is medically describable does not create a constitutional talisman that exempts the afflicted from Congress’s legitimate immigration policies.

*1082
C. Ledezma Failed to Identify Similarly Situated Groups

At the majority’s encouragement, Le-dezma submitted a supplemental brief arguing that it was irrational to distinguish between habitual drunkards and individuals with heart disease, cancer,. diabetes, syphilis, and HIV. But these groups are not similarly situated to habitual drunkards “in those respects relevant to [Congress’s] policy.” Arizona Dream Act Coalition v. Brewer, 757 F.3d 1053, 1064 (9th Cir.2014). At a broad level, there is no evidence that the undifferentiated class of individuals with “medical diseases” are responsible for 3 out of 4 instances of spousal abuse, 55% of fatal driving events, or 3 million violent crimes per year. Even descending to the particulars, Ledezma proffered no evidence that individuals suffering from the conditions that he listed pose the same kind of threat to public safety as habitual drunkards. Because these groups are not similarly situated with respect to the government's legitimate policy interest, Congress had a rational basis for treating habitual drunkards differently.
Moreover, nobody chooses to have heart disease, cancer, diabetes, or other such diseases. There is a volitional element to habitual, drunkenness that distinguishes that condition from diseases generally. To be sure, there are connections between lifestyle choices and some other medical conditions, such as between smoking and lung cancer. .But it is not irrational for Congress to view that connection as substantially more attenuated or to decide to treat .those afflicted with those diseases differently than those who are habitual drunkards,.
The' majority, dissatisfied with Ledez-ma’s selection of control groups and undeterred by the fact that'it is the petitioner’s burden to negative every conceivable basis in support of the statute, argues, at 1077, that it is irrational to distinguish between chronic alcoholics and individuals with bipolar disorder, because individuals with bipolar disorder also have an increased incidence of aggressive and violent behavior. But habitual drunkards are distinguishable from individuals with bipolar disorder. Whereas the contribution of alcohol to crimes of violence is substantial, “the contribution of people with mental illnesses to overall rates of violence is small,” and “the magnitude of the relationship is greatly exaggerated in the minds of the general population.” Institute of Medicine, Improving the Quality of Health Pare for Mental and Substance-Use Conditions 103 (2006). Congress had a rational basis for distinguishing between the mentally ill and habitual drunkards — habitual drunkards pose .a far more serious threat to public health and safety.
Even if the classification chosen by Congress was arguably under-inclusive, that is not a rational basis problem. A statute does not fail rational-basis review merely because it was “not made with mathematical nicety or because in practice it results in some inequality.” Heller v. Doe, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quotation marks and citation omitted).
In sum, none of the groups that Ledez-ma cited are similarly situated to habitual drunkards in the respects relevant to Congress’s-exclusion.

D. The Majority Applies Heightened Scrutiny By Stealth

The rational basis test sets out a standard that is not difficult to satisfy. Statutory- classifications enjoy “a strong presumption- of validity.” Beach Communications, 508 U.S. at 314, 113 S.Ct. 2096. “[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable ba *1083 sis that might support it[.]” Id. at 315, 113 S.Ct. 2096 (internal quotation marks and citation omitted). Courts must refrain from engaging in “courtroom fact-finding” and must indulge every reasonable inference in support of a statute. Id. “Where there are plausible reasons for Congress’ action, our inquiry is at an end.” Id. at 313-14, 113 S.Ct. 2096 (internal quotation marks and citation omitted).
These standards are common grist for the appellate mill, yet the majority opinion bypasses them almost entirely. Nowhere does the majority apply a presumption of constitutionality. Nowhere does it hold the Petitioner to his burden of negating every conceivable rationale offered in support of the law. It rejects as unpersuasive the scientific and behavioral data indicating that overcoming chronic alcoholism involves free will. The majority opinion is cast in the language of rational basis review, but it sidesteps the essential question, which is whether Congress had a rational basis for excluding habitual drunkards from discretionary deportation benefits.
The majority prefers to focus on Congress’s manner of acting, i.e., its use of a moral character framework. But whether Congress chose the best method to do something that it undoubtedly has the authority to do is the stuff of narrow tailoring. In short, the majority opinion has applied heightened scrutiny by stealth, and in so doing, has usurped Congressional authority in an area where that authority is at its apex.
IV. The Pointlessness of This Decision
I cannot help but wonder about the point of the exercise undertaken by the majority opinion. That Congress has the power to exclude aliens with medical conditions is unquestioned, even though there is no fault or moral component to most diseases. There are reasons, for Congress to decide that the country should not accept or harbor sick aliens who might infect others’ or whose treatment might impose heavy costs. There are reasons for Congress to decide that habitual drunkards in particular should be excluded because of the harm- they might do' to others and the heavy costs that their presence might impose on this country. Nobody has contended that it would be irrational for Congress directly to provide that aliens who are habitual drunkards are ineligible for cancellation of removal. The majority simply doesn’t like the way that Congress has accomplished that result, by way of the requirement for “good moral character.” But what good does the piajority opinion really accomplish by preventing Congress from doing something that it surely could do directly? I do not see the point.
V. Conclusion
The rational basis test sets a very low bar, .and Congress has exceptionally broad power in,. determining which classes of aliens may remain in the country. The statute at issue here, 8 U.S.C. § 1101(f)(1), should easily clear that bar. The majority holds that it does not by subverting.the standards of rational basis review to sub? stitute its policy preference for that of Congress.
Properly applied, rational basis review “is a paradigm, of judicial restraint.” Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096. Regrettably, the majority opinion is not. It is an unwarranted intrusion on separation of powers, and it demands correction.
I respectfully dissent.