# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 12, 2011          Decided April 13, 2012

No. 11-5065

HEIN HETTINGA, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01637)

———

*Alfred W. Ricciardi* argued the cause and filed the briefs
for appellants.

*Kelsi Brown Corkran*, Attorney, U.S. Department of
Justice, argued the cause for appellee. With her on the brief
were *Tony West*, Assistant U.S. Attorney, and *Michael S.
Raab*, Attorney.
*R. Craig Lawrence*, Assistant U.S. Attorney, entered an
appearance.

*Charles M. English Jr.* was on the brief for *amici curiae*
United Dairymen of Arizona, et al. in support of appellee.

Before: SENTELLE, *Chief Judge*, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* BROWN, with whom *Chief Judge* SENTELLE joins.

Concurring opinion filed by *Circuit Judge* GRIFFITH.

PER CURIAM:

Plaintiff-appellants Hein and Ellen Hettinga appeal the dismissal of their constitutional challenges to two provisions of the Milk Regulatory Equity Act of 2005 ("MREA"), Pub. L. No. 109-215, 120 Stat. 328 (2006) (codified at 7 U.S.C. § 608c). The Hettingas alleged that the provisions, which subjected certain large producer-handlers of milk to contribution requirements applicable to all milk handlers, constituted a bill of attainder and violated the Equal Protection and Due Process Clauses. The district court disagreed, and we affirm.

# I

Milk markets in the United States are regulated by a complex system of price controls dating back to the New Deal. The Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601–74 ("AMAA"), authorizes the Secretary of Agriculture to issue regional milk marketing orders that govern payments from milk processors and distributors ("handlers") to dairy farmers ("producers"). *Id.* § 608c(1). Under a typical milk market order, a dairy farmer supplies raw milk to a processor or distributor, and the handler pays money into a centralized "producer settlement fund" at fixed prices based on the intended use of the milk. *Edaleen Dairy*

*LLC v. Johanns,* 467 F.3d 778, 779–80 (D.C. Cir. 2006). Handlers using their milk for "high value" uses, such as fluid milk, pay higher prices than handlers that engage in "low-value" uses, such as the processing of butter or cheese. *Id.* The money that handlers pay into the producer settlement fund is then proportionally redistributed to milk producers at a uniform "blend price" based on quantity of milk sold. *See* 7 U.S.C. § 608c(5)(B)(ii). This system ensures that all dairy farmers receive the same price for their raw milk regardless of whether they sell to high-value or low-value handlers.

Firms that operate as both producers and handlers create serious complications for this system. In such cases, there is no opportunity for the producer-handler to pay into the centralized producer settlement fund because there is no intermediate sale of raw milk. *Edaleen Dairy,* 467 F.3d at 780. Until recently, the Secretary of Agriculture therefore exempted producer-handlers from the pricing and pooling requirements of federal milk marketing orders. *Id.* The pricing and pooling requirements also did not apply to handlers who sold milk in geographic areas that were not regulated by federal milk marketing orders, even if the handler itself was located in a federally-regulated area.

The Hettingas own two dairy operations that fell within these exemptions. The first is Sarah Farms, an integrated producer-handler located in Yuma, Arizona. Sarah Farms processes and sells over three million pounds of its own milk per month in the federally regulated Arizona Marketing Area. The second is GH Dairy, an independent milk processing plant which they own in partnership with their son. GH Dairy, a handler located in Arizona, processes raw milk into bottled milk and milk products that are sold exclusively in California. Because California is not a federally regulated

milk marketing area, GH Dairy was not subject to the federal pricing and pooling requirements.

On February 24, 2006, the USDA adopted a Final Rule that would have eliminated the producer-handler exemption for firms that operate in the Arizona and Pacific Northwest Marketing Areas and sell more than three million pounds of their own milk per month—a group that includes Sarah Farms. *See Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders,* 71 Fed. Reg. 9,430 (Feb. 24, 2006) ("USDA Rule"). The decision to eliminate the exemption for these large producer-handlers was based on evidence of "disorderly marketing conditions"— specifically, that large producer-handlers were obtaining a "competitive sales advantage" over fully-regulated handlers, and were causing a "measurabl[e] and significant[]" decrease in the blend price being paid to regulated producers. *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders,* 70 Fed. Reg. 74,166, 74,186–88 (Dec. 14, 2005). The USDA Rule was scheduled to go into effect on April 1, 2006. The Hettingas filed suit in the U.S. District Court for the Northern District of Texas, challenging the legality of the USDA Rule and seeking a preliminary injunction. Oral argument was scheduled for March 29, 2006.

On the day before the Texas district court heard arguments in the Hettingas' case, Congress amended the AMAA by passing the MREA.[1] President Bush subsequently signed the MREA into law on April 11, 2006. Subsection N

---

[1] The Texas district court denied the Hettingas' motion for a preliminary injunction against the USDA Rule, and the Hettingas voluntarily dismissed their case. *See* Compl. at ¶¶ 45–46.

of the MREA, 7 U.S.C. § 608c(5)(N), codified the USDA Rule's revocation of the exemption for large producer-handlers in the Arizona Marketing Area**,** including Sarah Farms. Unlike the USDA Rule, however, it applied neither to Nevada, which Congress exempted from coverage by any federal milk marketing orders, nor to the Pacific Northwest Milk Marketing Area. Subsection M of the MREA, *id.* § 608c(5)(M), imposed the federal pricing and pooling requirements on handlers, like GH Dairy, that were located in a federally regulated area but sold packaged milk exclusively in a state not covered by a federal milk marketing order, such as California.

The Hettingas challenged the constitutionality of the MREA in the U.S. District Court for the District of Columbia. First, they alleged that Subsections M and N of the MREA violate the Bill of Attainder Clause by singling them out for legislative punishment. Compl. ¶¶ 53–57. Second, the Hettingas claim the MREA denies them equal protection by "singling them out for adverse treatment that is extended to no other producer-handler in any other Milk Marketing Area." *Id.* ¶ 65. Finally, they claim the MREA denied them due process of law by foreclosing judicial review of the USDA Rule in the Northern District of Texas. *Id.* ¶ 60. The district court initially dismissed the Hettingas' claims for failure to exhaust administrative remedies, but this Court reversed and remanded, holding that the AMAA's exhaustion requirements do not apply to facial constitutional challenges. *Hettinga v. United States,* 560 F.3d 498, 504–06 (D.C. Cir. 2009). On remand, the district court dismissed the Hettingas' complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and denied leave to file a supplemental complaint. *Hettinga v. United States,* 770 F. Supp. 2d 51 (D.D.C. 2011).

We review *de novo* a district court's dismissal of a claim under Rule 12(b)(6). *Atherton v. Dist. of Columbia Office of the Mayor,* 567 F.3d 671, 681 (D.C. Cir. 2009). To survive a motion to dismiss, a complaint must have "facial plausibility," meaning it must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States,* 617 F.2d 605, 608 (D.C. Cir. 1979). Factual allegations, although assumed to be true, must still "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations. *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II

Article I, Section 9, cl. 3 of the United States Constitution states that "[n]o Bill of Attainder or *ex post facto* law shall be passed." A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Foretich v. United States,* 351 F.3d 1198, 1216 (D.C. Cir. 2003). To constitute a bill of attainder, a statute must: (1) apply with specificity to affected persons; (2) impose punishment; and (3) assign guilt without a judicial trial. *See Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.,* 468 U.S. 841, 846–47 (1984).

The element of specificity may be satisfied if the statute singles out a person or class by name or applies to "easily ascertainable members of a group." *Foretich,* 351 F.3d at 1217. A bill of attainder need not expressly name its target; some bills of attainder simply describe them. *BellSouth Corp. v. FCC,* 144 F.3d 58, 62 (D.C. Cir. 1998). The "easily ascertainable" requirement is only satisfied where the challenged statute "describe[s] [the targeted class] in terms of conduct which, because it is *past conduct*, operates only as a designation of particular persons." *Communist Party of the United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 86 (1960) (emphasis added). Indeed, the Supreme Court has recognized a "decisive distinction" between statutes that impermissibly punish past actions and those that permissibly address future conduct. *Am. Commc'ns Ass'n, C.I.O. v. Douds,* 339 U.S. 382, 413–14 (1950).

The MREA does not identify Sarah Farms, GH Dairy, or the Hettingas by name. Nonetheless, the Hettingas claim their businesses constitute an "easily ascertainable" group because they are currently the only producer-handlers being regulated by the MREA. Specifically, Sarah Farms is currently the only producer-handler that meets the three-million-pounds-per-month threshold established by Subsection (N), and GH Dairy is currently the only handler located within the Arizona Marketing Area—but outside of Nevada—that sells exclusively in the California market. *See* Appellant's Br. at 20.

Longstanding Supreme Court precedent readily dispenses with this argument. Applicability of the MREA does not turn on the past conduct of producer-handlers, but rather regulates these dairy operations' *future* business decisions, such as the volume of milk they will produce and the markets into which they will sell their product. Moreover, the MREA would

apply to *any* producer-handler that meets its statutory requirements, not only the Hettingas. A statute with open-ended applicability, *i.e.,* one that "attaches not to specified organizations but to described activities in which an organization may or may not engage," does not single out a particular person or group for punishment. *Communist Party,* 367 U.S. at 86.

The Hettingas also argue that because the MREA *currently* applies only to their businesses, it *must* satisfy the specificity requirement. They further note that the designated category—producer-handlers that sell over 3 million gallons of milk per month—is not a group susceptible to ready enlargement, as it has taken the Hettingas many years to grow their businesses to their current scope. *See* Appellant's Br. at 24.

The Supreme Court has held, however, that even a statute that affects only one person does not necessarily apply with the requisite specificity to qualify as a bill of attainder. In *Nixon v. Administrator of General Services,* for example, the Supreme Court found no specificity in the Presidential Recordings and Materials Preservation Act, Pub. L. No. 93-526, 88 Stat. 1695 (1974), even though Title I referred to President Nixon by name and dealt exclusively with his papers. 433 U.S. 425, 471–72 (1977). Because Title II was open-ended and could apply to future presidents, the statute was not a bill of attainder. *Id.* The Court cautioned that the President's argument that "an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes" would "cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality." *Id.* at 470.

*Nixon* makes clear that a current "class of one" does not necessarily satisfy the specificity requirement, and the Court has never suggested that the likelihood of future expansion of the designated class should play any role in the specificity analysis. Much like Title II of the Presidential Recordings and Materials Preservation Act, the MREA can theoretically apply to an unlimited number of handlers who meet its statutory requirements. "Since virtually all legislation operates by identifying the characteristics of the class benefited or burdened," *BellSouth Corp.,* 144 F.3d at 63, the mere fact that the "class" currently happens to contain only one member does not transform an open-ended statute into a bill of attainder.

The Hettingas also claim that the district court procedurally erred by determining whether the Hettingas were easily ascertainable as the target of the legislation. While the Court is required to accept the truth of the plaintiffs' factual allegations and to draw inferences in their favor, it is *not* required to accept the plaintiffs' legal conclusions. *See Iqbal,* 129 S.Ct. at 1949. Whether or not the Hettingas' "identity as the target of the Congressional action is easily ascertainable," Compl. at ¶ 48, is a legal conclusion, not a factual allegation. The sole *factual* allegations offered by the Hettingas establish that Subsections M and N currently apply only to their businesses, *id.*, and that a few opponents of the legislation believed passage of the MREA was driven by special interest groups who wanted to remove the Hettingas' competitive advantage. *See id.* at ¶¶ 40–44. As explained above, these factual allegations simply do not satisfy the legal definition of an "easily ascertainable" group, as defined by the Supreme Court and this Circuit.

Because we find the MREA does not apply with specificity to affected persons, we need not decide whether it satisfies either of the remaining elements of a bill of attainder. We therefore affirm the district court's dismissal of the Hettingas' bill of attainder claim.

### III

We grant statutes involving economic policy a "strong presumption of validity." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314 (1993). A statutory classification that "neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. "Where there are plausible reasons for Congress' action, our inquiry is at an end." *Id.* at 313–14. The challenger bears the burden of showing that the statute is not a rational means of advancing a legitimate government purpose. *See Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 367 (2001).

The district court dismissed the Hettingas' equal protection claim because it found the MREA provides a rational means of ensuring orderly milk markets by (1) preventing handlers located in regulated regions from gaining advantages over their competitors by exporting milk to unregulated regions and (2) preventing large producer-handlers in a federally-regulated region from undercutting other handlers in that region with unregulated sales. On appeal, the Hettingas claim the district court applied too deferential a standard of review, arguing that rational basis review is "not [] toothless." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 439 (1982) (Blackmun, J., concurring).

Regardless of how Justice Blackmun characterized rational basis review, the Supreme Court's subsequent decisions in *Beach* makes clear that "not toothless" does not mean "growling." Here, the government provided a rational explanation for its decision to close two loopholes in the AMAA scheme—that large dairy businesses have used the exemptions to gain a substantial—and ultimately disruptive—competitive advantage over their regulated competitors. *Beach* requires us to accept this explanation and end our inquiry here. *See Beach Commc'ns,* 508 U.S. at 313–14. Although the classification might indeed be unfair to the Hettingas, mere disparity of treatment is not sufficient to state an equal protection violation.

The Hettingas reprise the claim that the district court erred by drawing factual conclusions at the pleading stage. Because the district court must accept their well-pled facts as true, the Hettingas argue, the only questions are whether (1) plaintiffs have shown that there are separate groups subjected to disparate treatment; and (2) there are facts suggesting this disparate treatment "may not be rational, or is not for legitimate purposes." Appellant's Br. at 47. In so arguing, the Hettingas again misstate the relevant legal standard. Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not "any reasonable conceivable state of facts that could provide a rational basis for the classification." *Dumaguin v. Sec'y of Health and Human Servs.,* 28 F.3d 1218, 1222 (D.C. Cir. 1994). Here, the government provided an explanation that is not only rational on its face, but also has been consistently recognized by the courts as legitimate. *See, e.g., Nebbia v. New York,* 291 U.S. 502, 529–37 (1934); *Lamers Dairy, Inc. v. Dep't of Agric.,* 379 F.3d 466, 473 (7th Cir. 2004); *Shamrock Farms Co. v. Veneman,* 146 F.3d 1177, 1183 (9th Cir. 1988).

**IV**

The Hettingas claim that the MREA violated their procedural rights under the Due Process Clause by foreclosing judicial review of the USDA's decision to implement the Final Rule. Specifically, the Complaint alleges that the MREA was passed in the House the night before oral argument on the Hettingas' motion for a preliminary injunction in *Hettinga v. Johanns*; an attorney for the government called the court's attention to the passage of the MREA at the hearing; and the court subsequently denied the Hettingas' motion for a preliminary injunction.

The Hettingas failed to plead the threshold requirement of a due process claim: that the government has interfered with a cognizable liberty or property interest. *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989). The Hettingas have no liberty or property interest in the regulatory status quo. The MREA does not implicate the Hettingas' liberty interest in practicing their profession because the statute does not prevent them from operating their dairies; it merely subjects them to certain regulations if they choose to continue to operate under their current business model. The statute also does not implicate the Hettingas' property interest in a cause of action, as the legislation did not actually terminate their ongoing claim against the USDA. Rather, the Hettingas themselves dismissed their still-nascent claim because they believed the legislation rendered it moot. *See* Compl. at ¶¶ 45–46. Moreover, Congress frequently enacts legislation that moots pending cases, and such action has never been found to raise any due process concerns.

**V**

Finally, we find that the district court did not abuse its discretion by refusing to allow the Hettingas to file a supplemental complaint. A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss. *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1099 (D.C. Cir. 1996). The Hettingas requested leave to supplement their claim with new allegations that arose from a political campaign commercial of Nevada Senator Harry Reid. The proposed amendments would have been futile, because Senator Reid's alleged support for the MREA does not support the Hettingas' claims that they are the "easily ascertainable" targets of the MREA, that the statute inflicts legislative punishment without a trial, or that the statute violates their Equal Protection or Due Process rights.

For the foregoing reasons, the decision of the district court is

*Affirmed.*

BROWN, *Circuit Judge,* with whom *Chief Judge* SENTELLE joins, concurring: I agree fully with the court's opinion. Given the long-standing precedents in this area no other result is possible. Our precedents forced the Hettingas to make a difficult legal argument. No doubt they would have preferred a simpler one—that the operation and production of their enterprises had been impermissibly collectivized—but a long line of constitutional adjudication precluded that claim.

The Hettingas' sense of ill-usage is understandable. So is their consternation at being confronted with the gap between the rhetoric of free markets and the reality of ubiquitous regulation. The Hettingas' collision with the MREA—the latest iteration of the venerable AMAA—reveals an ugly truth: America's cowboy capitalism was long ago disarmed by a democratic process increasingly dominated by powerful groups with economic interests antithetical to competitors and consumers. And the courts, from which the victims of burdensome regulation sought protection, have been negotiating the terms of surrender since the 1930s.

First the Supreme Court allowed state and local jurisdictions to regulate property, pursuant to their police powers, in the public interest, and to "adopt whatever economic policy may reasonably be deemed to promote public welfare." *Nebbia v. New York,* 291 U.S. 502, 516 (1934). Then the Court relegated economic liberty to a lower echelon of constitutional protection than personal or political liberty, according restrictions on property rights only minimal review. *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 (1938). Finally, the Court abdicated its constitutional duty to protect economic rights completely, acknowledging that the only recourse for aggrieved property owners lies in the "democratic process." *Vance v. Bradley,* 440 U.S. 93, 97 (1979). "The Constitution," the Court said, "presumes that, absent some reason to infer antipathy, even

improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Id.*

As the dissent predicted in *Nebbia,* the judiciary's refusal to consider the wisdom of legislative acts—at least to inquire whether its purpose and the means proposed are "within legislative power"—would lead to only one result: "[R]ights guaranteed by the Constitution [would] exist only so long as supposed public interest does not require their extinction." 291 U.S. at 523. In short order that baleful prophecy received the court's imprimatur. In *Carolene Products* (yet another case involving protectionist legislation), the court ratified minimalist review of economic regulations, holding that a rational basis for economic legislation would be presumed and more searching inquiry would be reserved for intrusions on political rights. 304 U.S. at 153 n.4.

Thus the Supreme Court decided economic liberty was not a fundamental constitutional right, and decreed economic legislation must be upheld against an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993). *See also Pac. States Box & Basket Co. v. White,* 296 U.S. 176, 185–86 (1935); *Steffan v. Perry,* 41 F.3d 677, 684–85 (D.C. Cir. 1994) (en banc).

This standard is particularly troubling in light of the pessimistic view of human nature that animated the Framing of the Constitution—a worldview that the American polity and its political handmaidens have, unfortunately, shown to be largely justified. *See* James Madison, *Notes of Debates in the Federal Convention of 1787,* at 39, 42 (W. W. Norton &

Co. 1987). Moreover, what the Framers theorized about the destructive potential of factions (now known as special or group interests), experience has also shown to be true. The Federalist No. 10, at 78, 81 (James Madison) (Clinton Rossiter ed., 1961). The judiciary has worried incessantly about the "countermajoritarian difficulty" when interpreting the Constitution. But the better view may be that the Constitution *created* the countermajoritarian difficulty in order to thwart more potent threats to the Republic: the political temptation to exploit the public appetite for other people's money—either by buying consent with broad-based entitlements or selling subsidies, licensing restrictions, tariffs, or price fixing regimes to benefit narrow special interests.

The Hettingas believe they are the victims of just such shenanigans. Compl. ¶¶ 40–45. And press accounts during the height of the controversy support the claim. *See* Dan Morgan, Sarah Cohen, & Gilbert M. Gaul, "Dairy Industry Crushed Innovator Who Bested Price-Control System," Wash. Post, Dec. 10, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/12/09/AR2006120900925.html. The Washington Post described Hein Hettinga as an American success story. He emigrated to the U.S. after World War II and started as a hired hand. By 1990, Hettinga owned half a dozen dairies and decided to build his own bottling business. A Costco vice president showed reporters copies of an e-mail he sent to Senator Reid during the legislative debate, explaining that Southern California purchasers of milk were the victims of "a brazen case of price gouging and profiteering by the strongest, largest market suppliers," who turned a deaf ear to the company's call for lower prices. Hein Hettinga changed all that. His arrangement with Costco "lowered the average price of milk by 20 cents a gallon

overnight" until two senators, one from each party, pushed through the milk legislation at issue in this case.

Very little seems to have changed since the Supreme Court's initial confrontation with the regulation of milk pricing in *Nebbia*. The state of New York, responding to falling prices caused by the Great Depression, created a Milk Control Board, which proposed to remedy weak demand by establishing a minimum price for milk, and making sale of milk at any lower price a crime. 291 U.S. at 515, 519. Leo Nebbia sold two quarts of milk and a five-cent loaf of bread for eighteen cents, and was convicted of violating the board's order. *Id.* at 515.

Even Justice McReynolds saw the irony. The law, he said, "impose[d] direct and arbitrary burdens upon those already seriously impoverished" to give special benefits to others. *Id.* at 557. "To him with less than 9 cents it says: You cannot procure a quart of milk from the grocer although he is anxious to accept what you can pay and the demands of your household are urgent! A superabundance; but no child can purchase from a willing storekeeper below the figure appointed by three men at headquarters!" *Id.* at 557–58.

To be sure, the economic climate in which the New York legislature enacted the law at issue in *Nebbia* was truly dire, but 78 years later, the same tired trope about "disorderly market conduct" is still extant. The Hettingas built their business on an exemption—one that was profitable for them and beneficial for consumers. The government acknowledged that the decision to eliminate the exemption was based on evidence that large producer-handlers were obtaining a "decisive competitive advantage" over fully-regulated handlers, Appellees' Br. at 7, and were causing a measurable and "significant[]" decrease in the blend prices being paid to

regulated handlers. *See* 70 Fed. Reg. 74,166, 74,186 (Dec. 14, 2005). As another court has noted, federal regulation of milk pricing "is premised on dissatisfaction with the results of competition." *Alto Dairy v. Veneman,* 336 F.3d 560, 562 (7th Cir. 2003). "[M]ilk price discrimination is intended to redistribute wealth from consumers to producers of milk." *Id.* Once again, the government has thwarted the free market, and ultimately hurt consumers, to protect the economic interests of a powerful faction. Neither the legislators nor the lobbyists broke any positive laws to accomplish this result. It just *seems* like a crime.

The judiciary justifies its reluctance to intervene by claiming incompetence—apparently, judges lack the acumen to recognize corruption, self-interest, or arbitrariness in the economic realm—or deferring to the majoritarian imperative. *But see* The Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The practical effect of rational basis review of economic regulation is the absence of any check on the group interests that all too often control the democratic process. It allows the legislature free rein to subjugate the common good and individual liberty to the electoral calculus of politicians, the whim of majorities, or the self-interest of factions. S*ee* Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 260 (2004).

The hope of correction at the ballot box is purely illusory. *See generally* Ilya Somin, *Political Ignorance and the Counter-Majoritarian Difficulty: A New Perspective on the Central Obsession of Constitutional Theory,* 89 Iowa L. Rev. 1287 (2004). In an earlier century, H. L. Mencken offered a blunt assessment of that option: "[G]overnment is a broker in pillage, and every election is a sort of advance auction sale of stolen goods." On Politics: A Carnival of Buncombe 331 (1996). And, as the Hettingas can attest, it's no good hoping

the process will heal itself. Civil society, "once it grows addicted to redistribution, changes its character and comes to require the state to 'feed its habit.'" Anthony De Jasay, The State 226 (1998). The difficulty of assessing net benefits and burdens makes the idea of public choice oxymoronic. *See id.* at 248. Rational basis review means property is at the mercy of the pillagers. The constitutional guarantee of liberty deserves more respect—a lot more.

GRIFFITH, *Circuit Judge*, concurring: I, too, agree fully with the per curiam opinion, but do not join my colleagues' concurrence with its spirited criticism of the Supreme Court's long-standing approach to claims of economic liberty. Although by no means unsympathetic to their criticism nor critical of their choice to express their perspective, I am reluctant to set forth my own views on the wisdom of such a broad area of the Supreme Court's settled jurisprudence that was not challenged by the petitioner.