# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 12, 2021      Decided August 12, 2022

No. 21-7014

ALTAGRACIA SANCHEZ, ET AL.,
APPELLANTS

v.

OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION AND
DISTRICT OF COLUMBIA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00975)

———

*Renée Flaherty* argued the cause for appellants. With her on the briefs was *Robert J. McNamara*.

*Adam J. Tuetken*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. On the brief were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Graham E. Phillips*, Assistant Attorney General.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH.

SRINIVASAN, *Chief Judge*: The District of Columbia's Office of the State Superintendent of Education regulates childcare facilities, including by setting minimum qualifications for their workers. In 2016, OSSE issued a rule requiring many childcare workers to obtain an associate's degree or its equivalent in a field related to early-childhood education. Two childcare workers and a parent filed this lawsuit to challenge the new college requirements. They allege violations of their substantive due process and equal protection rights, as well as of the nondelegation doctrine.

The district court initially dismissed plaintiffs' claims as unripe and moot. In a prior appeal, we found the case justiciable and reversed. On remand, the district court again dismissed, this time on the merits. In rejecting plaintiffs' substantive due process and equal protection claims, the court concluded that the college requirements are rational, including in the distinctions they draw between different classes of daycare workers. And in rejecting plaintiffs' nondelegation doctrine claim, the court held that the statute granting regulatory authority to OSSE bears an intelligible principle to guide the agency's work. We agree with the district court and affirm its judgment.

3

I.

We explained the background of this case in our prior opinion. *Sanchez v. OSSE*, 959 F.3d 1121, 1123–24 (D.C. Cir. 2020). We expand on that discussion here as relevant to the present appeal. Because the district court resolved the case at the motion-to-dismiss stage, we accept as true the facts pleaded in plaintiffs' complaint. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

A.

The D.C. Council enacted the Child Development Facilities Regulation Act of 1998 to modernize the city's licensing regime for childcare providers. *See* D.C. Law 12-215, 46 D.C. Reg. 274 (Apr. 13, 1999) (codified as amended at D.C. Code § 7-2031 et seq.). The Facilities Act applies to "[c]hild development facilit[ies]," which it defines as any "center, home, or other structure that provides care and other services, supervision, and guidance for children, infants, and toddlers on a regular basis, regardless of its designated name." D.C. Code § 7-2031(3). Rather than setting any specific standards in the statute, the D.C. Council directed the mayor to "promulgate all rules necessary" to establish "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training," among other subjects. *Id.* § 7-2036(a)(1)(A). The mayor has delegated that authority to OSSE. *See* Mayor's Order 2009-130, 56 D.C. Reg. 6883 (Aug. 21, 2009).

In 2016, OSSE issued new childcare regulations intended to "ensure that care provided in a licensed Child Development Facility is not only safe, but also supports children's healthy development and future academic achievement and success." 63 D.C. Reg. 11,279, 11,279 (Sept. 9, 2016). Those regulations

institute new minimum education requirements for certain classes of childcare workers. Broadly speaking, the regulations require many such workers to obtain an associate's degree or its equivalent in a field related to early-childhood education.

The specific requirements vary depending on where a childcare provider works. First, the regulations cover "expanded child development home[s]," which are private residences where two or more caregivers are responsible for up to twelve children. D.C. Mun. Regs. tit. 5-A, § 199. Caregivers in those facilities must obtain at least an associate's degree "with a major in early childhood education, early childhood development, child and family studies or a closely related field." *Id.* § 170.2(a)(1). The regulations also apply to teachers in "child development centers," which are childcare facilities serving more than twelve children outside the operator's home. *Id.* § 199. Teachers in those centers may comply with the regulations in either of two ways. Like expanded-home daycare workers, they may obtain an associate's degree in an early-childhood field. *Id.* § 165.1(a). If they already have a college degree in another field, they may instead complete at least twenty-four credit hours in subjects related to early-childhood education. *Id.* § 165.1(b).

Facilities may seek two types of waivers from the new college requirements. First, OSSE may grant experience waivers to qualified teachers who had worked in the same position continuously for the ten years preceding the rulemaking (from 2006 to 2016). *Id.* § 165.4. Second, OSSE may grant hardship waivers if the "demonstrated immediate economic impact or hardship on the [f]acility or staff member is sufficiently great to make immediate compliance impractical despite diligent efforts," so long as the facility or staff member meets or exceeds "the intent of the regulation for which the waiver is requested" and the welfare of children is not

jeopardized. *Id.* § 106.1. The decision whether to grant a waiver is committed to OSSE's discretion. *Id.* §§ 106.5, 165.4.

B.

Plaintiff Altagracia Sanchez immigrated to the United States from the Dominican Republic and provides daycare services in her home. Sanchez employs two assistant caregivers and is licensed to care for up to nine children. She has a law degree from a university in the Dominican Republic but has not attended college in this country. Under the regulations, she is classified as an "expanded home caregiver," so she must obtain an associate's degree in an early-childhood field. *Id.* § 170.2(a)(1).

Plaintiff Dale Sorcher is a teacher at a preschool. The preschool serves children ages zero to three and is licensed as a "child development center." Sorcher has three college degrees, but none of them is in an early-childhood field. To comply with the regulations, then, she must either obtain a degree in an early-childhood field or complete twenty-four credit hours in subjects related to early-childhood education. *Id.* § 165.1(a)–(b).

Sanchez and Sorcher, along with Jill Homan, a parent with two children in daycare, filed this lawsuit against OSSE to challenge the college requirements. They allege that the regulations infringe their substantive due process and equal protection rights and also violate the nondelegation doctrine. Sanchez and Sorcher argue that they can effectively care for children without going back to school, such that taking expensive college classes would serve no purpose. Enrolling in an associate's degree program would be especially difficult for Sanchez, given her limited English proficiency and the competing time demands of running her small business.

Homan posits that the college requirements will increase the costs of daycare while forcing some of her children's favorite teachers either to provide worse care while going back to school part-time or to quit their jobs entirely because they lack the time and money required to earn an associate's degree.

The district court initially dismissed plaintiffs' suit on threshold justiciability grounds, but we reversed and remanded for the court to consider the merits of plaintiffs' challenges. *Sanchez*, 959 F.3d at 1124–26. On remand, OSSE moved to dismiss plaintiffs' claims on the merits. The district court granted the motion in a thoroughly reasoned opinion. *Sanchez v. OSSE*, 513 F. Supp. 3d 101 (D.D.C. 2021).

The court held that plaintiffs had failed to state a viable claim on any of their three legal theories. As to plaintiffs' due process and equal protection claims, the court concluded that the regulations were subject to only rational-basis review and met that forgiving standard. *Id.* at 111–16. And as for plaintiffs' claim under the nondelegation doctrine, the court held that the Facilities Act satisfied the doctrine by adequately guiding OSSE's regulatory discretion. *Id.* at 108–11. Plaintiffs now bring this second appeal.

## II.

We review the district court's dismissal of the complaint de novo. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018).

## A.

We first consider plaintiffs' due process and equal protection claims. Before addressing whether OSSE had a rational basis for issuing the challenged regulations for

purposes of both of those claims, we first resolve a dispute about the applicable legal standard.

1.

The parties agree that plaintiffs' due process and equal protection claims are subject to rational-basis review. Plaintiffs first contend the college requirements "do[] absolutely *nothing*" to further any legitimate government interest, in violation of substantive due process. Sanchez Br. 40. Because the challenged requirements implicate no fundamental rights, they are reviewed only for a rational basis. *Heller v. Doe*, 509 U.S. 312, 319–20 (1993); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007) (en banc). Plaintiffs further allege that the college requirements draw irrational distinctions between different classes of childcare workers, in violation of their rights to equal protection. Because the challenged classifications "neither proceed[] along suspect lines nor infringe[] fundamental constitutional rights," their equal protection claim is also subject to rational-basis review. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

Although the parties agree that rational-basis review governs the resolution of the substantive due process and equal protection claims, they disagree about what that standard requires at the pleading stage. Plaintiffs identify a supposed tension between the procedural standard applicable to motions to dismiss and the substantive standard applicable to rational-basis challenges. But the ostensible tension, on examination, is illusory.

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 675 (2009). The court then determines whether the plaintiff has pleaded those elements with adequate factual support to "state a claim to relief that is plausible on its face." *Id.* at 678 (citation omitted); *see also Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). A claim is facially plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing the sufficiency of the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

To succeed on a rational-basis challenge, a plaintiff must meet a demanding standard. Rational-basis review affords the policy choices of the political branches "a strong presumption of validity." *Beach*, 508 U.S. at 314–15 (citing *Lyng v. Auto. Workers*, 485 U.S. 360, 370 (1988)). Judicial intervention under that standard "is generally unwarranted no matter how unwisely . . . a political branch has acted." *Id.* at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). A social or economic policy that "neither proceeds along suspect lines nor infringes fundamental constitutional rights" must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for the legislative choice. *Id.* at 313. And because legislative bodies are under no constitutional obligation to explain their reasons for enacting a policy, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315. A plaintiff bringing a constitutional challenge to a regulation on rationality grounds thus faces the unenviable task of refuting "every conceivable basis which might support it." *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Plaintiffs contend that the rational-basis standard, in asking a court to consider whether any reasonably conceivable state of facts supports a challenged policy, is incompatible with the motion-to-dismiss standard, which requires a court to accept as true the state of facts presented in the complaint. There is no incompatibility between those standards. It is true, as plaintiffs observe, that the "rational basis standard . . . cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard." *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992). But to survive a motion to dismiss, plaintiffs bringing rational-basis challenges still must plausibly plead facts supporting the elements of their claims, like plaintiffs must do in any case.

When rational-basis review applies, a plaintiff at the summary-judgment stage or at trial will ultimately "bear[] the burden of showing that the statute is not a rational means of advancing a legitimate government purpose." *Hettinga v. United States*, 677 F.3d 471, 478–79 (D.C. Cir. 2012) (per curiam). At the motion-to-dismiss stage, then, the plaintiff must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy. *Id.* at 479; *see Beach*, 508 U.S. at 313. Plaintiffs suggest that it would be all but impossible for a complaint to contain allegations that "negative every conceivable basis" for a challenged policy. *Beach*, 508 U.S. at 315 (citation omitted). In practice, however, pleading facts plausibly showing a challenged policy's irrationality will adequately negate any rational explanation for the policy so as to survive a motion to dismiss, without the complaint's needing to refute a laundry list of potential justifications. That is a tall task, but not an impossible one.

In sum, plaintiffs here were required to plausibly allege the elements of their claims, just like plaintiffs in any other case.

In the context of rational-basis review, that means plausibly alleging that no conceivable set of facts could support the challenged policy. Having clarified the standard, we can now apply it to plaintiffs' due process and equal protection claims.

2.

Plaintiffs first contend that the college requirements "do[] absolutely *nothing* to further" any legitimate government interest, in violation of substantive due process. Sanchez Br. 40. The district court held that OSSE could have rationally theorized that "more early childhood education for childcare providers will lead to better childcare." *Sanchez*, 513 F. Supp. 3d at 112. On appeal, plaintiffs concede both that occupational licensing regimes can properly incorporate minimum education requirements and that OSSE has an interest in promoting the educational growth of young children. But they challenge the fit between OSSE's means and its ends. They argue that an associate's degree in early-childhood education has nothing to do with the job of caring for young children.

Plaintiffs' argument that degrees in early-childhood education are irrelevant to education in early childhood is a contradiction in terms, and their position is undermined by the factual allegations in their own complaint. The complaint surveys colleges in the Washington, D.C., area that offer associate's degrees in early-childhood education. According to plaintiffs, those programs require students to complete roughly sixty credit hours. As in virtually all college programs, those credit hours are split between courses within the early-childhood major and courses in other subjects. The local schools listed in the complaint require between fifteen and thirty-six credit hours of early-childhood courses within the major, with the remainder of the curriculum composed of required general-education courses and elective courses.

Plaintiffs contend that at least some of the elective courses offered at local colleges, such as classes on fencing or Shakespeare, would be irrelevant to the work of a daycare teacher. And they point out that early-childhood courses cover ages zero to eight, while the District's childcare regulations cover only ages zero to three. But under rational-basis review, OSSE could reasonably conclude that the coursework required to earn an associate's degree in early-childhood education would be, generally speaking, relevant to the work of childcare providers. It's possible that certain schools might have some idiosyncratic course requirements. Even so, OSSE could rationally issue the challenged regulations without needing to parse the curriculum of any particular school.

Caregivers, moreover, can comply by completing the required education at any accredited college in the United States, affording them plenty of flexibility to choose a program that matches their career goals. And within a given school, even if some elective courses might have limited relevance to aspiring childcare workers, nothing would prevent students from tailoring their course selections to their career interest in caring for younger children. A variety of courses outside the early-childhood major, from math and English to art and history, could be beneficial to someone tasked with the educational development of toddlers—as any adult who has been flummoxed by a two-year-old repeatedly asking "why" can attest.

Even if all associate's degree programs contain at least some irrelevant content, OSSE still could have rationally concluded that requiring childcare workers to complete a predominantly relevant course of study will improve the quality of care young children receive. Under rational-basis review, OSSE had discretion to impose a requirement that is

"not . . . in every respect logically consistent with its aims," so long as it identified "an evil at hand for correction" and established "a rational way to correct it." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955). That standard is met here.

Plaintiffs seek to undermine that conclusion by invoking a smattering of out-of-circuit decisions holding that professional licensing regimes fail rational-basis review if they impose onerous training requirements that are irrelevant to the work actually done in a given field. *See, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013) (funeral-director licensing as applied to casket retailers); *Clayton v. Steinagel*, 885 F. Supp. 2d 1212 (D. Utah 2012) (cosmetology licensing as applied to African-style hair braiders); *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69 (Tex. 2015) (esthetician licensing as applied to eyebrow threaders). But this case involves no such mismatch between the content of the required training and the duties performed by the covered workers. Even assuming it is irrational to force a hair braider who never dyes hair to sit through a week of training on how to safely use hair dye, *see Steinagel*, 885 F. Supp. 2d at 1214–15, an associate's degree in early-childhood education is self-evidently (and rationally) connected to the work of caring for young children.

Under rational-basis review, the policy choices of the political branches are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach*, 508 U.S. at 315. And here, at any rate, as plaintiffs acknowledge in their complaint, OSSE issued its regulations in part based on a report from the National Academies recommending a bachelor's degree requirement for all educators of children ages zero to eight. *See* Transforming the Workforce for Children Birth Through Age

8: A Unifying Foundation, Inst. of Med. & Nat'l Rsch. Council (LaRue Allen & Bridget B. Kelly eds., 2015). The report sought to equalize the educational requirements for daycare workers and elementary school teachers, given that "the work of lead educators for young children of all ages is based on the same high level of sophisticated knowledge and competencies." *Id.* at 7; *see also id.* at 513. In light of that expert guidance, OSSE could have rationally concluded that its college requirements would improve the quality of childcare provided in licensed facilities.

Although we are sensitive to the burdens that OSSE's regulations impose on daycare workers, our role is not to assess the wisdom of the agency's policy choices. A conceivably rational justification for the college requirements is readily apparent, and, in this context, that is all due process requires.

3.

Plaintiffs also contend that the college requirements are "riddled with arbitrary distinctions among child-care providers" in violation of their equal protection rights. Sanchez Br. 35. "Where rationality is the test, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (alteration, quotation marks, and citation omitted). Defining the class of people subject to a regulatory requirement "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *Beach*, 508 U.S. at 315–16 (quotation marks and citation omitted). And in drawing those lines, a regulation "may select one phase of one field and apply a remedy there, neglecting the others." *Lee Optical*, 348 U.S. at 489. Equal protection "does not require that a State must choose between attacking every aspect of a

problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970). Rather, a regulation must only "be rationally based and free from invidious discrimination" to survive judicial review. *Id.* at 487.

Plaintiffs challenge three distinctions that the regulations draw between classes of childcare workers. All three are rational.

First, the regulations require childcare workers with no college education to complete an associate's degree with an early-childhood major. But they permit teachers in child development centers who already have college degrees in other fields to instead take twenty-four credit hours of early-childhood classes. Plaintiffs point out that some associate's degree programs in early-childhood education require fewer than twenty-four credit hours within that major. They thus argue that Sorcher, who has three college degrees, should not have to complete "*more* early-childhood coursework than another person with the same job who has no college education at all." Sanchez Br. 36.

While some local colleges require fewer than twenty-four credit hours of early-childhood classes for an associate's degree in that field, other colleges require more. For instance, according to plaintiffs' complaint, the University of the District of Columbia requires thirty-six credit hours of early-childhood classes for an associate's degree in infant and toddler education. And that is in addition to the general-education and elective courses needed to complete an associate's degree. OSSE could have rationally concluded that a degree in another field plus twenty-four credit hours of early childhood classes forms the rough equivalent of an associate's degree in early-childhood education, which requires sixty total credit hours, between fifteen and thirty-six of which are in early childhood

courses. As the district court correctly observed, twenty-four was a "rational, while perhaps rough" estimate of the number of early-childhood credit hours required for a degree in that field. *Sanchez*, 513 F. Supp. 3d at 115.

In any event, plaintiffs misperceive the nature of the education requirements. Rather than treating similarly situated teachers differently, the regulations simply open two avenues for compliance, which are equally open to all teachers in child development centers. Teachers can either earn an associate's degree in early-childhood education or earn a degree in another field and then take twenty-four credit hours of early-childhood classes. The choice is entirely up to them. If Sorcher would find it less burdensome to obtain an associate's degree in early-childhood education than to take twenty-four credit hours of classes, she has the option to comply with the regulations by completing a full early-childhood degree.

Second, the regulations apply to extended-home caregivers like Sanchez, but not to nannies, babysitters, or parents who lead neighborhood play groups. Plaintiffs argue that childcare providers do the same job "wherever they happen to work," so OSSE cannot rationally subject caregivers in different settings to different requirements. Sanchez Br. 38.

As a threshold matter, it is the Facilities Act, rather than the OSSE regulations, that exempts babysitters and neighborhood play groups. D.C. Code § 7-2033. OSSE thus lacked statutory authority to regulate those less formal care arrangements. And plaintiffs' complaint does not challenge the exemptions in the Facilities Act.

Regardless, rational justifications for the challenged exemptions are apparent. Nannies and babysitters typically work for a single family within the home, and OSSE could have

rationally decided to respect parents' autonomy to hire childcare providers without college degrees to work in their homes. The case for exempting parent-led play groups is even more evident: any attempt by OSSE to require parents to obtain associate's degrees in early-childhood education before supervising their kids' friends would raise significant questions. Plaintiffs make no effort in their complaint to explain why it is irrational to treat a professional caregiver in a daycare setting differently than a weekend babysitter or a parent supervising a play group.

Third, and lastly, the regulations apply to the preschool where Sorcher teaches, which is connected to a synagogue that offers after-school programming to elementary and high school students. But the regulations exempt daycares and preschools connected to full-time elementary and high schools. Once again, plaintiffs argue that those caregivers do the same work and cannot rationally be treated differently. And once again, plaintiffs do little in their complaint to explain why the differential treatment is irrational. A rational explanation for the regulatory distinction is plainly apparent. OSSE could have rationally concluded that daycares attached to full-time schools would be more likely to have qualified teachers. And full-time schools are subject to their own comprehensive regulatory scheme, which includes minimum qualifications for teachers. *See* D.C. Mun. Regs. tit. 5-A, § 1601. OSSE properly prioritized "one phase of one field and appl[ied] a remedy there." *Lee Optical*, 348 U.S. at 489.

The distinctions that the regulations draw between classes of childcare workers are rational.

B.

Plaintiffs allege that the Facilities Act violates the nondelegation doctrine by granting OSSE unconstrained authority to set licensing standards for daycares. We hold that plaintiffs have failed to state a plausible nondelegation claim.

Before addressing whether the Facilities Act satisfies the nondelegation doctrine, we first consider whether the nondelegation doctrine even applies to the District's government. In their complaint, plaintiffs present their nondelegation claim under both the Constitution and the D.C. Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01 et seq.).

OSSE argues that plaintiffs' nondelegation claim "has no footing in the Constitution." The constitutional nondelegation doctrine derives from the federal separation of powers. Article I vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. Because that authority is exclusive, the nondelegation doctrine "bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality opinion). Here, OSSE points out that the D.C. Council, not Congress, enacted the Facilities Act. OSSE contends that the federal separation of powers imposes no limits on the authority of the D.C. Council to delegate power to OSSE.

Perhaps recognizing the force of the OSSE's argument in that regard, plaintiffs contend in the alternative that the nondelegation doctrine applies to the District through the Home Rule Act, a proposition OSSE does not appear to contest in this case. Congress wields plenary power over the nation's capital, including power to create a local government for the District. U.S. Const. art I, § 8, cl. 17; *District of Columbia v.*

*John R. Thompson Co.*, 346 U.S. 100, 109 (1953); *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889). In designing that government, Congress presumably could vest legislative authority in any local body of its choosing. But through the Home Rule Act, Congress decided to give the District's government a tripartite structure modeled on that of the federal government, with legislative power vested in the D.C. Council, executive power in the mayor, and judicial power in the D.C. Superior Court and Court of Appeals. *See* D.C. Code §§ 1-204.04(a); 1-204.22; 1-204.31(a).

The D.C. Court of Appeals has observed that the separation of powers within the District's government suggests that "the same general principles should govern the exercise of such power in the District Charter as are applicable to the three branches of government at the federal level." *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992). There is thus "good reason to think the nondelegation doctrine applies to the District's government." *Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 232 (D.C. 2020).

Ultimately, though, we need not decide whether the nondelegation doctrine applies to the District, either through the Constitution or the Home Rule Act. Instead, following the lead of the D.C. Court of Appeals, *id.*, we will assume without deciding that the doctrine applies. We may do so because we conclude that, even if the doctrine applies, it is satisfied here.

The nondelegation doctrine requires a legislature delegating authority to "lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (alteration, quotation marks, and citation omitted). The legislature must make clear the "general policy" to be pursued and "the boundaries of this delegated

authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

The amount of guidance the legislature must provide "varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. For instance, Congress must give "substantial guidance" to the Environmental Protection Agency to channel its setting of "air standards that affect the entire national economy," but "need not provide any direction" at all to that agency for defining the statutory term "country elevators." *Id.*

In applying the nondelegation doctrine, the Supreme Court "has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress"—and, by analogy, the D.C. Council—"simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The governing standards for a permissible delegation are "not demanding," and the Supreme Court has "over and over upheld even very broad delegations." *Gundy*, 139 S. Ct. at 2129 (plurality opinion); *cf. id.* at 2131 (Alito, J., concurring in the judgment) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort."); *id.* at 2131–48 (Gorsuch, J., dissenting).

Under the current standard, the Facilities Act sets forth an intelligible principle to guide OSSE's regulation of daycares. The Act directs OSSE to issue "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training." D.C. Code § 7-2036(a)(1)(A). That provision directs OSSE's regulatory authority to a particular subject matter (minimum staff qualifications and training) in a particular industry (childcare).

Within that narrow sphere, the D.C. Council can delegate considerable discretion. *See Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F.3d 895, 902–03 (D.C. Cir. 2018); *TOMAC v. Norton*, 433 F.3d 852, 867 (D.C. Cir. 2006).

The Facilities Act's definitions section provides further direction. Under the statute, a "[c]hild development facility" is any "center, home, or other structure that provides care and other services, supervision, and guidance for children, infants, and toddlers on a regular basis." D.C. Code § 7-2031(3). The implication of the Act, read as a whole, is that the minimum qualifications should relate to the care, supervision, and guidance of children. In short, the Facilities Act supplies the intelligible principle that OSSE must set minimum qualifications for daycare workers to ensure their fitness to take care of small children.

As OSSE points out, the United States Code contains many comparable delegations. For example, the Transportation Security Administration sets "minimum training requirements" and "minimum education levels" for "air carrier personnel." 49 U.S.C. § 44935(a). The Secretary of the Treasury establishes "minimum education and experience requirements" for certain tax appraisers. 26 U.S.C. § 170(f)(11)(E)(ii)(I). And the Secretary of Health and Human Services sets "training, education, and experience requirements" for certain physician assistants and nurse practitioners. 42 U.S.C. § 1395x(aa)(5)(A). Delegations of authority to set minimum job qualifications are thus commonplace. We decline plaintiffs' invitation to call into question such a ubiquitous type of delegation.

In the alternative, plaintiffs contend that, even if the Facilities Act includes an intelligible principle, any guidance the statute provides is merely "hortatory" because OSSE's

rulemaking was not subject to judicial review under the District's version of the Administrative Procedure Act. Sanchez Br. 49–50. In plaintiffs' view, an intelligible principle serves no purpose unless a court can police the agency's compliance with the legislative command.

That argument is doubly flawed. First, it appears that OSSE's rulemaking would have been reviewable in D.C. Superior Court. True enough, the D.C. Administrative Procedure Act provides for judicial review of agency actions only in "contested case[s]," a term the D.C. Court of Appeals has interpreted as covering only formal adjudications. D.C. Code § 2-510; *District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996). But despite that statutory lacuna, the District's courts have permitted equitable actions challenging rulemakings. *See id.*; *see also Dupont Circle Citizen's Ass'n v. D.C. Zoning Comm'n*, 343 A.2d 296, 309–10 & n.26 (D.C. 1975) (Gallagher, J., concurring).

Second, even if the college requirement were unreviewable for compliance with the Facilities Act, that would be irrelevant to the analysis under our precedent. We have held that, even when judicial review is unavailable, the nondelegation doctrine is satisfied so long as a statute provides an intelligible principle to guide an agency's exercise of discretion. *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 33 n.8 (D.C. Cir. 2008). The Facilities Act does so and thus complies with the nondelegation doctrine, assuming the doctrine applies to the District.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring: Though not necessarily central to this case, the Supreme Court's nondelegation jurisprudence appears to be in a state of flux. *See* Joseph Postell & Randolph J. May, *The Myth of the State Nondelegation Doctrines*, 74 ADMIN. L. REV. 263, 264–65 (2022).  Of course, we are bound to apply the Supreme Court's current precedent, since only the Supreme Court enjoys "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  Because the majority evaluates the nondelegation claims presented here under current doctrine, I join its analysis.