# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 5, 2025          Decided June 23, 2026

No. 24-5034

GENGSHU SCOTT HE, ET AL.,
APPELLANTS

v.

MARCO RUBIO, UNITED STATES SECRETARY OF STATE, IN HIS
OFFICIAL CAPACITY AND UNITED STATES OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01137)

*Mitchell J. Rotbert* argued the cause and filed the briefs for appellants.

*Jeremy S. Simon*, Assistant U.S. Attorney, argued the cause for appellees.  With him on the brief were Jeanine Ferris Pirro, U.S. Attorney, and *Jane M. Lyons*, Assistant U.S. Attorney.  *Johnny H. Walker III*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, PILLARD and WILKINS, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Former State Department employee Gengshu He and his family sued the Secretary of the Department of State (State Department) and the United States under the Federal Tort Claims Act, claiming that two law enforcement officers with the State Department came to their home in Virginia; beat on their front door; threatened, cursed and shouted at He; and grabbed him by the wrist in front of the family. Before leaving the Hes' home, one of the officers pointed his fingers in the shape of a gun at He's minor son, pretended to shoot the boy and called him a racial slur. In this appeal, we consider whether it is plausible that the officers' alleged conduct meets the requirements for common law assault against He's family members. We conclude that it is plausible. We therefore reverse the district court's dismissal of the He family's claim and remand for further proceedings.

**I**

The following facts come from the operative complaint. Gengshu He is a naturalized American citizen who was born in China. He immigrated to this country with his mother when he was approximately ten years old. Raised in Philadelphia, He went to public school, graduated with high marks and went on to earn his bachelor's degree in computer science at Penn State University. In 2006, He joined the federal workforce, working IT positions at several government agencies before joining the State Department in 2014. Apart from a brief stint at the Department of Agriculture, He remained at the State Department until July 2021. He has a wife, Jun Zhang (also an American citizen of Chinese descent) and two sons, both of "elementary school age." App. 13 (citation modified). They

live together in Annandale, Virginia, along with Zhang's parents, Wenqing and Rong Zhang.

This case arises out of a tense encounter at the He residence. On the late Friday afternoon of February 12, 2021, He and his family were at their home preparing celebrations for the Chinese New Year. They were also self-quarantining to protect themselves from COVID-19 and had posted signs outside their residence excluding visitors. At around 4:00 p.m., the family heard a "loud banging" at the front door that "continu[ed] for more than thirty seconds." App. 24. With his "wife and two children . . . huddled behind" him and his in-laws standing close by, He opened the door. *Id.* Standing on the Hes' front patio were two men in "dark clothing." *Id.* He recognized one of the men as Michael Peart, a law enforcement officer with the Bureau of Diplomatic Security at the State Department where He worked.

This was not He's first encounter with Peart. He claims that while he was employed at the State Department, Peart targeted him for harassment based on his status as a Chinese immigrant. By He's telling, the problems began as early as March 2019. While He was at his workstation one day, Peart approached him, "slapped him on the shoulder and back" and said "[t]here you are, the troublemaker." App. 18. Peart then ordered He to follow him to a room where another law enforcement officer was waiting. For the next two hours, Peart and his colleague questioned He about his status as a Chinese immigrant and pressured He "to admit to some wrongdoing that Peart never defined." App. 19. After the encounter, Peart continued to harass He by phone and email, demanding that He agree to a follow-up meeting and "confess" to misconduct. App. 21. The last of these communications He received from Peart was on February 9, 2021. Peart's email stated that He was under administrative investigation for undisclosed

misconduct and insisted that He attend an "official interview." App. 23.

Three days after He received Peart's email, Peart was standing at He's front door, unannounced and uninvited, in the company of another man who "identified himself only as 'Ken.'" App. 24.[1] In front of He's wife, children, and in-laws, Peart said that he had given He "enough time to come clean" and had come to "ambush" him at his home. App. 25. When He claimed "not [to] know what Peart was referencing," Peart "cursed" and "shouted" at He, reached across the threshold and grabbed He by the wrist. *Id.* He's two children then began to cry and He felt his wife "trembling" behind him. App. 26. He pulled away from Peart's grip and "told [him] to keep his distance." App. 25. Peart then stated that he wanted to give He his business card. When He instructed Peart to put it on the patio, Peart "cursed again and threw the card on the ground." App. 25. Peart turned his attention to one of He's young sons. Peart then "made a pretend gun using his forefinger and thumb," pointed it at the child, "pressed his thumb down as if to shoot," laughed and called the child a "little chink." App. 26. Before leaving, Peart repeated his demand that He agree to an "in-person" interview at the State Department. *Id.* Peart and his associate departed shortly thereafter.

He claims the confrontation with Peart traumatized his family. After the incident, He's in-laws "experienced insomnia and depression." App. 27. He's sons could not sleep alone and suffered from nightmares. One of the boys, four years old at the time, wet his bed on multiple nights.

---

[1] The man was later identified as Kenneth Velez, another law enforcement officer with the State Department's Diplomatic Security Bureau.

In April 2022, He and his family sued the Secretary of the State Department and the United States (collectively, the Secretary) in district court. He asserted claims of employment discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and claims of common law assault, battery and false imprisonment under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.* The complaint also asserted, on behalf of He's wife, two children and in-laws (He's family or the He family) a single claim of common law assault under the FTCA based on Peart's actions at the He residence on February 12.

The district court granted in part and denied in part the Secretary's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court held that He's Title VII claims failed to state a plausible claim of retaliation or discrimination. As for He's FTCA claims, the court concluded that the Secretary had raised a "non-frivolous" argument that a separate statute—the Federal Employees Compensation Act (FECA), 5 U.S.C. § 8101, *et seq.*—divested the court of jurisdiction of the claims. App. 88–89. The court therefore stayed adjudication of He's FTCA claims "pending a . . . determination by the [Secretary of the] Department of Labor" regarding whether FECA covered He's claims. App. 89.

Lastly, the district court dismissed the He family's FTCA claim for common law assault arising from the February 12 incident with Peart. Because the incident occurred at the Hes' home in Annandale, the district court applied Virginia law. In the court's view, the He family's assault claim was implausible on its face because Peart's alleged misconduct—although "threatening" and "deplorable"—did not place any of He's family members in reasonable apprehension of imminent physical harm. App. 90–91.

He could proceed with his FTCA claims in federal court only if the Secretary of Labor first determined that FECA did not cover his injuries. *See Daniels-Lumley v. United States*, 306 F.2d 769, 771 n.3 (D.C. Cir. 1962). Once the Secretary filed a joint status report with the district court representing that He did not intend to file the FECA claim with the Department of Labor to allow for the requisite ruling on whether FECA applied, the district court lifted its stay of He's FTCA claims—the only remaining claims—and dismissed them for lack of jurisdiction. He and his family appealed and the Secretary moved for summary affirmance. We granted the Secretary's motion as to He's claims under Title VII and the FTCA. But we denied the motion as to the He family's assault claim under the FTCA because the merits were "not so clear as to warrant" summary affirmance on their claim. App. 100.

## II

We have jurisdiction under 28 U.S.C. § 1291 and our review of the district court's dismissal of the He family's FTCA claim under Rule 12(b)(6) is *de novo*. *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1345 (D.C. Cir. 2007). The FTCA permits private individuals to sue the United States for money damages "for certain torts committed by federal employees acting within the scope of their employment." *Martin v. United States*, 605 U.S. 395, 400 (2025) (citation modified); *accord* 28 U.S.C. §§ 1346(b)(1), 2674. To state a claim under the FTCA, the plaintiff must plausibly allege that "the United States, if a private person, would be liable to the claimant" under "the law of the place" where the government employee's wrongful "act or omission occurred." 28 U.S.C. § 1346(b)(1); *accord Brownback v. King*, 592 U.S. 209, 218 (2021). As their sole FTCA claim, the He family asserts that the Secretary is liable under Virginia law for the common law tort of assault based on Peart's actions at the Hes' Annandale

residence. We therefore begin our analysis by "tak[ing] note of the elements [the He family] must plead" under Virginia law to state a claim of common law assault against the Secretary. *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)); *see Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911 (D.C. Cir. 2015).[2]

Virginia follows the Second Restatement of Torts for the elements of common law assault. *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003); *see Shoemaker v. Funkhouser*, 856 S.E.2d 174, 178 n.2 (Va. 2021) ("We have often accepted the Second Restatement of Torts as authoritative."). And "[l]ike many jurisdictions, Virginia has merged the common law crime [of assault] with the common law tort of assault." *Clark v. Commonwealth*, 691 S.E.2d 786, 789 (Va. 2010). We therefore rely on Virginia's criminal assault cases to aid our analysis.

Common law assault in Virginia consists of three elements. First, there must be at least one "overt act" by the defendant; "words alone are never sufficient to constitute an assault." *Id.* Obvious examples of overt acts include "aiming and gunning a speeding vehicle" at a person, *Zimmerman v. Commonwealth*, 585 S.E.2d 538, 540 (Va. 2003), or "striking at [another] with a stick or other weapon," *Harper v. Commonwealth*, 85 S.E.2d 249, 255 (Va. 1955). But the act itself "does not require the present ability to inflict harm." *Carter v. Commonwealth*, 606 S.E.2d 839, 842 (Va. 2005). It

---

[2] The FTCA also requires a plaintiff asserting an assault claim to allege that the tortfeasor was an "investigative or law enforcement officer[]" at the time of the misconduct. 28 U.S.C. § 2680(h); *accord Martin*, 605 U.S. at 401. The He family has plausibly alleged that Peart and his associate were law enforcement officers at the time of the alleged assault.

can be as simple as "moving towards" someone in a threatening manner. *Blankenship v. Commonwealth*, 838 S.E.2d 568, 575 (Va. Ct. App. 2020).

Second, the defendant must intend that the overt act "cause either harmful or offensive contact with another person *or* apprehension of such contact." *Koffman*, 574 S.E.2d at 261 (emphasis added). The defendant's "intent may be inferred from the nature of the overt act and the surrounding circumstances." *Clark*, 691 S.E.2d at 789. His "[w]ords and prior conduct are highly relevant" as well. *Id.* And to show the defendant acted with the required intent, it is not always necessary to prove that the defendant specifically intended to place the plaintiff in fear of harm. If the defendant acts "with the intention of affecting a third person . . . but puts [the plaintiff] in apprehension of a harmful or offensive contact," that is sufficient. Restatement (Second) of Torts § 32(2) (A.L.I. 1965 Sept. 2025 update). This result obtains because common law assault in Virginia follows the doctrine of transferred intent—the principle "that if one person intends to harm a second person but instead unintentionally harms a third, the first person's criminal or tortious intent toward the second applies to the third as well." *Transferred-Intent Doctrine*, Black's Law Dictionary (12th ed. 2024); *see Blow v. Commonwealth*, 665 S.E.2d 254, 258 (Va. Ct. App. 2008) ("[I]t is clear that the [transferred-intent] doctrine is a viable part of our law.").

Third, the overt act or acts must in fact create a "reasonable apprehension" of offensive or harmful contact that is "imminent." *Koffman*, 574 S.E.2d at 261. As with the intent requirement, the defendant's "previous statements and actions," *Clark*, 691 S.E.2d at 789, help determine whether the overt "act [was] sufficient to create a reasonable apprehension on the part of" the plaintiff, *id.* at 790. The plaintiff's own

actions can also "demonstrate that [he] reasonably feared a threat of bodily injury." *Blankenship*, 838 S.E.2d at 574. "Imminent" bodily harm or contact, moreover, "does not mean immediate, in the sense of instantaneous contact," Restatement (Second) of Torts § 29(1) cmt. b, although that is plainly sufficient. The plaintiff need only have the reasonable fear that the harmful or offensive contact will occur "in a very short interval of time" or without "significant delay." *Id.*

### III

Our task at the Rule 12(b)(6) motion-to-dismiss stage is to "determine[] whether the [He family] has pleaded th[e] elements" of assault with enough "factual support to 'state a claim that is plausible on its face.'" *Sanchez*, 45 F.4th at 395 (quoting *Iqbal*, 556 U.S. at 678). Facial plausibility "requires 'more than a sheer possibility that a defendant has acted unlawfully,' but it is not a 'probability requirement.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). A claim is facially plausible if "the plaintiff pleads factual content that allows [us] to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In applying that standard, courts "do[] not resolve contests surrounding the facts [or] the merits of a claim." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (citation modified); *accord* 5B *Wright & Miller's Federal Practice and Procedure* § 1356 (4th ed. Apr. 2026 update). The time for that comes later in the proceedings. At this early stage, we "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences" in the He family's favor, *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).

The He family's complaint paints a vivid picture of what happened at their residence on that late Friday afternoon in February 2021. While the Hes were at home, Peart and his associate approached their front door and "loud[ly] bang[ed]" on it for more than thirty seconds. App. 24. The men "had no explained reason for being" there. *Clark*, 691 S.E.2d at 789. They were not welcome guests; the Hes had posted signs outside of their home declining visitors. With his family directly behind him, He opened the door to confront the visitors. Standing before them were "[t]wo men, wearing dark clothing" with no "identifying marks or uniform[s]." App. 24. "The men did not identify themselves" until He recognized one of them to be Peart. *Id.* Once identified, Peart stated that this was an "ambush" and He's family watched as Peart "cursed" and "shouted" at He, "reached . . . inside the threshold" and "grabbed" He by the wrist. App. 25. After He had pulled away, Peart noticed one of the He's children "huddled" behind their father. App. 24. Peart then pointed his thumb and forefinger in the shape of a gun at the young boy, pressed his thumb down "as if to shoot" the child, laughed and called the boy a "little chink." App. 26.

We think these facts are sufficient to state a plausible claim of assault under Virginia law. Based on the allegations in the complaint, Peart's act of grabbing He by the wrist easily satisfied the first two elements of assault; it was an overt act "intended to cause either harmful or offensive contact with another person or apprehension of such contact." *Koffman*, 574 S.E.2d at 261. The Secretary's suggestion that Peart grabbed He merely to "give [him] a business card," Sec'y's Br. 21, is implausible on its face given the aggressive "nature of the overt act," *Clark*, 691 S.E.2d at 789. Nor is the Secretary correct that Peart's grabbing of He cannot establish an assault against He's family members because they were not "the focus of that alleged act." Sec'y's Br. 21. As noted earlier, to prevail on a

claim of assault it is not necessary that the plaintiff be the intended target of the overt act. If the defendant commits the act "with the intention of affecting a third party" but "puts [the plaintiff] in [reasonable] apprehension of a harmful or offensive contact," that is an assault. Restatement (Second) of Torts § 32(2). In this case, Peart's deliberate act of grabbing He could amount to an assault against the rest of the He family if Peart's act, viewed "in the context of [his] previous statements and actions," *Clark*, 691 S.E.2d at 789, caused He's family to reasonably fear imminent bodily harm—satisfying the third element of assault.

On the third element, it is plausible that Peart's conduct caused He's family to reasonably fear imminent harm to themselves. As an initial matter, the family has pleaded sufficient facts demonstrating that Peart's conduct "caused [them] to actually . . . fear bodily harm." *Blankenship*, 838 S.E.2d at 574. When they saw Peart reach into their home and grab their family member, He's two children started crying and He's wife was "trembling." App. 26. He's in-laws were also "frightened" during the incident. App. 25. That He's family members "felt threatened by [Peart's] behavior" is clear from the face of their complaint. *Blankenship*, 838 S.E.2d at 574; *cf. Etherton v. Doe*, 597 S.E.2d 87, 89 (Va. 2004) ("The plaintiff testified unequivocally that she was 'really, really frightened'" by the defendant's conduct).

In our view, it is also plausible that a reasonable person in the He family's position would fear for his safety. Peart's behavior towards the Hes was aggressive from the moment he arrived on their doorstep. Peart and his associate came to the Hes' home even though they were "not welcome on [the] property." *Blankenship*, 838 S.E.2d at 575. They "loud[ly] bang[ed]" on the Hes' front door. App. 24. In front of the entire group, Peart announced that he had come to "ambush"

one of their family members.  App. 25.  The family then watched as Peart became belligerent, "curs[ing]" and "shout[ing]" at He, and physically aggressive as he reached into their home and seized He by the wrist.  *Id.*  We will not attempt to pin down the definite point in time when the family's fear of imminent harm ripened into a reasonable one.  But it is plausible the moment came when the family witnessed Peart reach inside and physically grab one of their family members.  Because of their proximity to Peart's conduct, Peart's inexplicable behavior in the moments prior and especially his sudden escalation to battery, it is plausible that He's family members reasonably feared Peart was going to harm them as well.

The Secretary argues the allegations do not plausibly show the He family was in reasonable fear of "imminent" harm because the family does not allege they were "within Peart's reach" when Peart grabbed He.  Sec'y's Br. 22.  The district court similarly faulted the family members for not "alleg[ing] that Peart advanced beyond the doorway to within striking distance of" them.  App. 90.  We think this asks too much of the He family.  As a general matter, "we do not require [such] detailed factual allegations" at the Rule 12(b)(6) motion-to-dismiss stage.  *Banneker Ventures, LLC*, 798 F.3d at 1129 (citation modified).  And in any event, "[i]t is not necessary that [the plaintiff] be within striking distance of the" defendant for the feared harm to be sufficiently "imminent" to cross the line into assault.  Restatement (Second) of Torts § 29(1) cmt. b; *see, e.g.*, *Blankenship*, 838 S.E.2d at 575 (defendant assaulted victim by "moving towards" him from "about twenty feet away" while threatening to do bodily harm).  The He family's allegations indicate they were within a few feet of Peart as he physically grabbed their family member.  That is a close enough distance for us to infer that Peart could have done them

harm without "significant delay." Restatement (Second) of Torts § 29(1) cmt. b.

Peart's subsequent act of making his fingers into the shape of a gun and pointing at He's young son also plausibly satisfied the elements of assault. There is no serious dispute that Peart's "threatening gesture," *Bowie v. Murphy*, 624 S.E.2d 74, 80 (Va. 2006), was an overt act, *see Carter*, 606 S.E.2d at 842–43. Whether Peart "inten[ded]" the act "to cause a fear of bodily harm," *Blankenship*, 838 S.E.2d at 574, "the nature of the overt act" and the defendant's surrounding "statements and actions" can reveal whether the defendant's purpose was to instill fear, *Clark*, 691 S.E.2d at 789. Here, Peart pantomiming the act of shooting He's child—in front of the child—was an inherently threatening act. And the Secretary's suggestion that Peart's act was merely intended as a joke (Peart laughed afterwards) is belied by everything Peart allegedly did and said immediately before and after the act. We have already covered Peart's threatening "[w]ords and prior conduct" but their outrageousness bears repeating—his unexpected "[]appearance at [the family's home] where []he had no explained reason for being," his "unconditional threat," *Clark*, 691 S.E.2d at 789, to "ambush" the child's father, App. 25, his "curs[ing]" and "shout[ing]" at the father and his physical force against the father. App. 25. That is all "highly relevant" evidence, *Clark*, 691 S.E.2d at 789, supporting the reasonable inference that Peart "intended to place [He's child] in fear or apprehension of bodily harm" by imitating the act of shooting him, *id.* at 790. That Peart called the child a racial slur afterward is further proof that Peart's purpose behind his act was to instill fear.

As for the last element, it is plausible that Peart's act "caused [He's son] to actually and reasonably fear [imminent] bodily harm." *Blankenship*, 838 S.E.2d at 574. We can easily

infer that Peart's act put fear into him—Peart's conduct on February 12 caused the child to have "nightmares" for "several weeks." App. 26. On whether Peart's act was "sufficient to create a reasonable apprehension" in He's son, *Clark*, 691 S.E.2d at 790, "[w]e must interpret" Peart's act in the context of everything the child saw Peart do immediately before, *id.* at 789. He's son had just witnessed Peart threaten, curse, shout at and manhandle his father. Under the circumstances, he could have reasonably believed that Peart's threatening gun gesture was a prelude to the use of more physical force—this time against him.

The Secretary contends that Peart's hand-gun gesture is not an actionable assault because it was apparent that Peart was not pointing an "actual gun" at He's son. Sec'y's Br. 24. We think the Secretary's observation misses the point. That Peart's act may not have caused He's son to reasonably fear being shot does not mean the act did not create a reasonable fear of imminent bodily harm—however carried out. And as we have explained, it is plausible that Peart's act did create such a fear in the boy. That is all the He family was required to allege at the dismissal stage.

\* \* \*

For the foregoing reasons, the judgment of the district court is reversed.

*So ordered.*